David GOLLINGER, Appellant,

v.

The STATE of Texas, Appellee.

No. A14–91–00487–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

July 2, 1992.

Clay Moore, Houston, for appellant.

**554**

Carol Cameron, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

### J. CURTISS BROWN, Chief Justice.

David Gollinger, appellant, was charged by information with the misdemeanor offense of criminal trespass. Appellant entered a plea of not guilty. The jury found him guilty, and the trial court assessed punishment at two days confinement in the Harris County Jail and a fine in the amount of $250.00. Appellant raises three points of error complaining that: 1) the trial court erred by excluding evidence relating to his license to be on the property; 2) the trial court erred by failing to dismiss the criminal charges against him as violative of his Constitutional rights to freedom of speech and assembly; and 3) the evidence is factually insufficient to support the jury finding that he received notice to depart from the property owner or someone with apparent authority to act for the owner. We affirm.

On February 19, 1991, the Metropolitan Transit Authority (Metro) held a general job bid at the Kashmere garage in the office of the General Foreman, Donna Laforce. A general job bid involves employees bidding on jobs for the six Metro operating facilities. Bids are made on the basis of skills and seniority, and allow employees to bid on a job with the shift, or days off, that they want. People are scheduled to come in and bid, one at a time, in three minute intervals in order of their seniority. Employees can go to the closest facility to bid, call in their bid, or give it to the Union Steward and the Steward will make their bid.

The bidding process was being conducted by John Franks (Franks), the Director of Bus Maintenance. Appellant was a Maintenance Labor Representative for the Transport Workers Union and was present at the bid. He was on a leave of absence from Metro and working for the union full time as a union official. Appellant and Franks had agreed about a week before the bid, that Franks "would pay a Steward at each location to represent the Union, and the jobs that would be posted, how long they would be posted, [and] how you could bid...." A Union Steward, unlike appellant, is a working mechanic or cleaner. The Steward is someone "working on the floor and he is Steward when they need a Steward." The Union Steward for the Kashmere facility was Leon Hosea (Hosea), and he was present in the office at the beginning of the bid process.

The bidding began about 7:30 a.m. and appellant came in "a little while after" it got started. Appellant was invited to be present, Metro management knew he was coming to the premises, and expected him to be present at the bidding process. The fourth or fifth person scheduled to bid was Allen Isles (Isles). Isles attempted to bid on a job which Franks did not believe he had the skills to perform. "There was a brief discussion on qualifications" between appellant and Franks. Isles then asked what would happen if he did not bid. He was informed that he would be placed back in his old job, or in a similar job. Isles decided not to bid on a job if he could not bid on his first choice. At that time, appellant stated he was cancelling the bid, meaning "the Union people" were not going to bid. Bids are not usually stopped completely when there is a problem with the process. The bid may be stopped for a short period to allow discussion, but there is a grievance process if the Union has a problem with the bid.

Appellant and Isles left the office and went out into the hallway. The Union Steward, Hosea, followed them out into the hall. After a discussion between Isles and appellant, Isles went back to work. Although appellant did not have the authority to cancel the bid, he could advise the union members of the Union's position that the bidding process was not proper. Appellant and Hosea stood in the hallway as the bidding process continued, informing employees not to bid because the bid was cancelled. Most employees "would turn around and go back to work" instead of bidding on a job. Franks came out of the office after approximately 15 minutes and

told Hosea "if he was not going to be part of the process, that he had to go back to work in order to get paid." Hosea went back to work. About ten or twelve people came and went without bidding. Then, Joseph Taylor (Taylor) actually came into the office to make a bid. Appellant began shouting at Taylor, calling him a fence jumper and a scab. After a discussion with his supervisor, Russell Pentz, Franks went into the hallway and told appellant "that he could be part of the process and come in the office, and if he didn't want to be part of the process, he couldn't disrupt the operation, he had to leave." Appellant told Franks "he had a right to be there." Franks and appellant had this conversation at least three times before Franks told appellant "if he didn't leave, [Franks] was going to call the Transit Police." Appellant was "very disruptive" to the bidding process and was intimidating people who wanted to bid. Employees "would not bid because he was there and the people on the floor that were supposed to be working were not working." Franks called the Transit Police and they arrived just before the ten-minute break at 9:00 a.m. Franks explained to the officers "what was going on and how [appellant] was being disruptive to the bid." Franks had the authority to ask appellant to leave the premises because he was in charge of all the operating facilities, and he had the "day-to-day" authority to control who came and went, and what transpired on the premises of the Kashmere facility.

Shortly after the police arrived, everyone at the facility went on break and gathered in the hall outside of the General Foreman's office. There were approximately 60 to 75 people in the hallway. Franks' "first impression [of the crowd] was a near riot." The first Transit police units to arrive on the scene called for additional units to be sent to the Kashmere facility. Sergeant Robert Jones (Jones) was one of the backup officers that responded to the call. Upon his arrival, he went into the General Foreman's office to find out about the disturbance. Meanwhile out in the hall, the break period ended and appellant told employees "that this was not the appropriate time to take this type of action, and that this was an issue that the Union should deal with management on" and he "asked them ... to go back to work."

When Jones came out of the office, appellant was still in the hallway. Franks had informed Jones that appellant "was not wanted on the premises, and that the supervisor in charge, [Franks], would pursue charges if the gentleman would not leave...." "At that point [Jones] determined to find out if the [appellant] would leave." Jones told appellant "that he was not wanted on the property and that he would have to leave." Appellant calmly stated "he was not going to leave." Jones repeated the warning four times before placing appellant under arrest. Appellant refused to comply with Jones' request to put his hands against the wall. Jones "had to usher him over to the wall and had him put his hands on the wall, which he did not want to do, and then ... patted him down."

In point of error one, appellant alleges the trial court erred by excluding evidence relating to appellant's license to be on the property where the alleged criminal trespass took place. Appellant claims he had a license to be on the property based upon the collective bargaining agreement between Metro and the Union, and based upon the General Bid Memo. He relies on the holding in *Hann v. State*, for the proposition that he could not be guilty of criminal trespass because he and Franks had a bona fide dispute as to appellant's right of access to the facility. *See Hann v. State*, 771 S.W.2d 731 (Tex.App.—Fort Worth 1989, no pet.).

 The *Hann* case involved a tenant's use of an easement across the complainant's property. *Id.* at 732. The landlord granted his tenant the easement under a right to grant such easements which the landlord had reserved in a deed and which was reaffirmed in a settlement agreement with the complainant. *Id.* at 732–33. The easement was the disputed issue in *Hann*. An easement is an interest in land, and carries with it some right to use, or benefit from, the land for a specified purpose. *See Coughran v. Nunez*, 133 Tex. 303, 127

S.W.2d 885 (Tex.1989). In the instant case, appellant had no easement or interest in the Metro property. There was no possessory right to the property conveyed to appellant because there was a collective bargaining agreement in place, or because he was invited to participate in the bidding process. The *Hann* case is not applicable to the facts in this case.

In order to be admissible, evidence must be relevant. *Mayes v. State*, 816 S.W.2d 79 (Tex.Crim.App.1991). *See* TEX.R.CRIM.EVID. 402. Under the Rules of Criminal Evidence, relevant evidence is defined to be "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.CRIM.EVID. 401. Thus, the evidence is relevant if it "influences consequential facts, i.e., facts which have something to do with the ultimate determination of guilt or innocence in" this case. *Mayes*, 816 S.W.2d at 84.

■ There was ample evidence that appellant had permission to be on the premises. Appellant's guilt or innocence was to be determined on whether he received notice from the "owner" to depart the premises, and thereafter knowingly remained at the Kashmere garage. The terms and conditions of the General Bid Memo, the collective bargaining agreement, prior grievances, the labor agreement, and the job descriptions for different mechanics are not relevant to appellant's prosecution for criminal trespass. As the trial judge sagely observed during a bench conference, appellant was in the wrong forum to be pursuing a breach of the collective bargaining agreement cause of action. The trial court did not err in excluding the complained of evidence. We overrule appellant's point of error one.

In point of error two, appellant complains that the trial court erred by failing to dismiss the charges against him as violative of his Constitutional rights of freedom of speech and assembly.

The Texas constitutional guarantees of freedom of speech and assembly "are coextensive with the federal guarantees, and we will apply the same analysis and principals of construction in interpreting them." *Gibbons v. State*, 775 S.W.2d 790, 794 (Tex. App.—Dallas 1989, pet. ref'd); *Reed v. State*, 762 S.W.2d 640, 644 (Tex.App.—Texarkana 1988, pet. ref'd), *cert. denied*, 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). The public's entitlement to protection of their first amendment rights on public streets and sidewalks is undisputed. *Gibbons*, 775 S.W.2d at 792 (citing *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972)). However, the area in which appellant was conducting his activities was a nonpublic forum.[1] Speech, in a nonpublic forum, "may be restricted so long as the regulations are reasonable and do not attempt to suppress expression because of public officials' opposition to the speaker's views." *Reed*, 762 S.W.2d at 644.

■ Further, "[t]he purpose of the criminal trespass statute applied in this case is not to regulate speech," but "to regulate conduct." *Gibbons*, 775 S.W.2d at 794; *Reed*, 762 S.W.2d at 644. Although it has been recognized that First Amendment protection goes beyond the spoken or written word, *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989), "[t]he Constitution does not guarantee that those who want to propagandize their views may do so wherever and however they please." *Reed*, 762 S.W.2d at 643 (citing *Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). Section 30.05, a general trespass statute, "may be constitutionally applied, even to those who trespass to communicate, so long as it is applied without discrimination and is not used to purposefully suppress speech." *Gibbons*, 775 S.W.2d at 794 (citing *United*

---

1. A nonpublic forum is one "which neither by tradition nor government action ha[s] become [a] forum for public communication." *Reed*, 762 S.W.2d at 643 (quoting *Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). In other words, it is not "an area which by tradition has been devoted to public assembly or debate by the general public." *Id.* 762 S.W.2d at 644.

*States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). *See* TEX.PENAL CODE ANN. § 30.05 (Vernon 1989 & Supp.1992).

■ In the instant case, the testimony was clear that Franks gave appellant ample opportunity to be a part of the bid process. There is no testimony to indicate that appellant could not have stood in the bid office and advised potential bidders that the Union felt the process was improper. Franks did not ask the appellant to leave, even after he left the office, until he began disrupting the bid process, distracting the workers from their jobs, calling employees who placed a bid names, and generally intimidating employees who came to place a bid. There is no evidence that appellant was asked to leave the premises because he was advising employees of the Union's position on the bid process. Appellant was asked to leave because of his disruptive behavior. Therefore, his constitutional rights of free speech and assembly were not violated by the enforcement of the criminal trespass statute. We overrule appellant's point of error two.

In point of error three, appellant contends the evidence is factually insufficient to support the jury finding that he received notice to depart from the owner or someone with apparent authority to act for the owner. He bases this argument on the fact that the complaint and information alleged he "did intentionally and knowingly enter and, after receiving notice to depart, remain on property owned by John Franks, hereafter styled the Complainant, without the effective consent of the Complainant." Appellant alleges the Complainant, John Franks did not own the property.

■ In reviewing the sufficiency of the evidence, the Court must view "all the evidence in the light most favorable to the verdict" and determine whether a rational trier of fact could have found the evidence sufficient to establish beyond a reasonable doubt that appellant intentionally and knowingly remained on the property after being requested to leave by the owner, John Franks. *Villalon v. State,* 791 S.W.2d 130, 132 (Tex.Crim.App.1990) (quot-

ing *Blankenship v. State,* 780 S.W.2d 198, 206–07 (Tex.Crim.App.1988)). *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard is the same whether we are reviewing the sufficiency of circumstantial or direct evidence. *See Geesa v. State,* 820 S.W.2d 154 (Tex. Crim.App.1991). The trier of fact may reconcile conflicts in the testimony and accept or reject any or all of the evidence on either side. *Hernandez v. State,* 538 S.W.2d 127, 131 (Tex.Crim.App.1976); *Banks v. State,* 510 S.W.2d 592, 595 (Tex.Crim.App.1974).

In subsection (b) of section 30.05, the term "notice" is described as an "oral or written communication by the owner or someone with apparent authority to act for the owner...." TEX.PENAL CODE ANN. § 30.05(b)(2)(A) (Vernon Supp.1992). The term "owner" is defined in the Penal Code to mean "a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." TEX.PENAL CODE ANN. § 1.07(a)(24)(A) (Vernon Supp.1992).

■ In this case, the appellant himself testified that Franks asked him to leave and he refused. Franks testified that he asked appellant to leave at least three times before telling appellant he was going to call the police. Each time he was asked to leave, appellant responded that he had a right to be there and refused to leave the premises. The bid process was taking place at the Kashmere Garage, property belonging to Metro. Franks testified he was the Director of Bus Maintenance for Metro, he was in charge of all the operating facilities of which the Kashmere Garage was one, and he had the "day-to-day" authority to control who comes and goes, and what transpires on the premises of the Kashmere facility. There is ample evidence to support the jury's finding that appellant received "notice" to depart the premises from John Franks, an owner as defined in the Penal Code, and thereafter intentionally and knowingly remained on the property. We overrule appellant's point of error three.

The judgment of the trial court is affirmed.