**Michael Miller THOMPSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 09–98–343 CR.

Court of Appeals of Texas, Beaumont.

March 22, 2000.

David Gerger, Foreman, DeGeurin, Nugent & Gerger, Houston, for appellant.

Tom Maness, Crim. Dist. Atty., John B. Ross, Asst. Crim. Dist. Atty., Beaumont, for State.

## OPINION

WALKER, Chief Justice.

Michael Miller Thompson, pastor of the Spindletop Unitarian Church, was charged by information with the misdemeanor offense of Criminal Trespass by "intentionally and knowingly remain[ing] on the property of another, namely, DENNIS ROZELL, without the effective consent of DENNIS ROZELL, and the said defendant had received notice to depart but failed to do so[.]" A jury found Thompson guilty of said offense and punishment was assessed by the trial court at ninety (90) days in the Jefferson County Jail and a fine of $200. The trial court suspended imposition of both incarceration and fine and placed Thompson on community supervision for a period of six months. Thompson brings forward seven appellate issues for our consideration.

■ We begin with issues three and seven as they complain of the lack of legally sufficient evidence to support the conviction. The evidence before us includes the transcription of verbal testimony contained in the reporter's record as well as two video tapes depicting the events leading up to the arrest of Thompson. The video tapes depict the events in question from two separate and distinct perspectives. Specifically, issue three contends:

> The court erred in denying appellant's motion for instructed verdict for insufficient evidence: The evidence was insufficient that Rev. Thompson remained on property of Dennis Rozell without effective consent and received notice to depart but failed to do so.

The trial court's written instructions to the jury contained several definitions of key terms. We reproduce the ones set out under paragraph 2 as follows:

> By the term "notice," as used herein, is meant oral or written communication by the owner or someone with apparent authority to act for the owner.

> By the term "enter" or "entry," is meant intrusion of the entire body.

> By the term "effective consent," is meant assent in fact, whether express or apparent, and includes consent by a person legally authorized to act for the owner.

> The term "owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the defendant.

> By the term "possession" is meant actual care, custody, control, or management of the property.

Mr. Thompson contends that he did not receive sufficient notice to depart. Testimony of Detective W.C. Tatum of the Beaumont Police Department indicated that he was in attendance at the church where the seminar was taking place merely as a spectator. Tatum testified that he first noticed Thompson when Thompson began to disrupt the meeting. This was apparently during certain remarks being made by the speaker at the podium, Dennis Rozell, the pastor of Highland Avenue Baptist Church. Thompson, who was sitting very close to the podium, began to make loud comments apparently in response to statements being made by Rozell. At a certain point after Thompson had again made an audible remark, Rozell informed him that if he interrupted again he would be removed from the church. Thompson immediately replied with, "I'd like to see you try." Rozell then turned to security personnel and stated, "I would like for him to be removed." At that point, Detective Tatum, being in plain

clothes, felt that it would be less confrontational if he [Tatum] approached Thompson and asked him to leave the premises. Tatum testified that he had met Thompson several weeks earlier and Thompson knew Tatum to be a police officer.

The video tape depictions of the events indicate that Detective Tatum approached Thompson from behind, leaned over Thompson's shoulder, began speaking to Thompson with Thompson responding verbally. Thompson then appears to gather up various papers and a tape recorder and place these items into a briefcase. Thompson, in a seated position, begins to bend at the waist in order to stand up. He hesitates momentarily, straightens back up in a seated position, crosses his legs and then looks up at Tatum who is standing in front of him. Tatum leans forward and reaches out and touches Thompson on his elbow as if to assist him in standing up. Thompson appears to make no attempt to stand up under his own power. Thompson is then physically pulled off of the bench into a kneeling position by Tatum and other uniformed security personnel. Thompson appears to make no attempt to stand. Security personnel then grasp Thompson's arms and legs and carry him, face down, up the aisle of the church. It is at this point that both tapes end.

In addition to the visual depiction of the events, Detective Tatum's testimony described the events in the following manner:

Q.[State's Attorney] Okay. And were you the first individual to approach Reverend Thompson?

A. Yes, sir.

Q. Okay. What—describe that contact at that time.

A. Well, I explained to him that he'd been asked to leave; and he was going to have to leave. He refused to leave.

Q. What did he say—what was the first thing he said back to you, if you can recall?

A. That he didn't have to leave. It was a public—public place and he had a right to be there and he wasn't going to leave.

Q. Okay. Was he correct about that?

A. No, sir.

Q. What did you tell him?

A. I explained to him that if the preacher asked him to leave that he didn't have a choice, that he had to leave or he was trespassing, one or the other.

Q. Do you recall what he said at that point, or what he did at that point?

A. Said he wasn't going to leave. I told him he was under arrest for trespassing.

Q. And what happened next?

A. He started gathering up his briefcase and tape recorder and some other things, got them ready but then when he got—got them all ready, sat back down and said he wasn't going to leave.

Q. Okay. Did he start to get up?

A. Started to, yes, sir.

Q. And then what did he do?

A. Sat back down.

Q. What happened next?

A. I got him by the arm, and he was going to have to leave.

Q. And after that what happened? How did it—did he say anything—

A. Well, he dropped down to his knees and I was going to have to carry him out but some other officers were right behind me and they helped me carry him out.

■ A challenge to the trial court's ruling on a motion for instructed or directed verdict is treated as a challenge to the legal sufficiency of the evidence. *See Cook v. State,* 858 S.W.2d 467, 470 (Tex.Crim. App.1993) (citing *Madden v. State,* 799 S.W.2d 683 (Tex.Crim.App.1990)). In reviewing the legal sufficiency of the evidence to support a conviction, our task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's finding and to determine whether, based on that

evidence and those inferences, a rational jury could have found all of the essential elements of the offense beyond a reasonable doubt. *Richardson v. State,* 879 S.W.2d 874, 879 (Tex.Crim.App.1993). As factfinder, the jury may accept or reject any or all evidence. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991). That the defendant presents a different factual version does not render the evidence insufficient. *Anderson v. State,* 701 S.W.2d 868, 872–73 (Tex.Crim.App.1985); *Lynch v. State,* 952 S.W.2d 594, 596 (Tex. App.—Beaumont 1997, no pet.).

Based upon the record evidence before us, especially the testimony of Detective Tatum, we find that Thompson was provided with sufficient notice to depart, provided an opportunity to depart, and intentionally refused to depart. The evidence indicates that Detective Tatum was "someone with apparent authority to act for the owner" as provided for in the definition of "notice." *See* Tex. Pen.Code Ann. § 30.05(b)(2)(A) (Vernon Supp.2000). His testimony of his verbal communication with Thompson as well as Thompson's responses supply the essential elements of the offense so that any rational trier of fact could have found them proven beyond a reasonable doubt. Thompson's third issue is overruled.

■■■ Issue seven mistakenly argues that the information alleged Rozell as the "owner" of the property in question and that there is no evidence to support ownership in Rozell. As set out above, the information alleged that Thompson remained "on the property of *another,* namely Dennis Rozell, . . ." (emphasis added). Tex. Pen.Code Ann. § 30.05 (Vernon Supp. 2000), the criminal trespass provision, requires only that the defendant enter or remain on property of *another.* To explicitly use the word "owner" instead of the word "another" is to plead an unnecessary allegation. *See Langston v. State,* 855

S.W.2d 718, 721 (Tex.Crim.App.1993) (plurality opinion). Had the State pleaded that the property in question was "owned" by Rozell, it would have assumed the burden of proving said allegation. *Id.*[1] In the instant case, because the State merely pleaded "property of *another*" rather than explicit ownership in a particular person, the evidence in the record is legally sufficient to support that element of the offense. Issue seven is overruled.

■■■ Appellate issue one complains of a number of instances of allegedly improper jury arguments on the part of the State. To be proper, jury argument must encompass summation of evidence presented at trial, reasonable deductions drawn from said evidence, answers to opposing counsel's argument, or plea for law enforcement. *Lagrone v. State,* 942 S.W.2d 602, 619 (Tex.Crim.App.1997). However, before a defendant will be permitted to complain on appeal about an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling. *McFarland v. State,* 989 S.W.2d 749, 751 (Tex.Crim.App.1999). In *Arriola v. State,* 969 S.W.2d 42, 44 (Tex.App.— Beaumont 1998, pet. ref'd), we observed that the Court of Criminal Appeals warned of the dangers of slavish adherence to the order in which a defendant presents his objection, request for instruction to disregard, and motion for mistrial. *See Fuller v. State,* 827 S.W.2d 919, 926 (Tex.Crim. App.1992). However, we can find no case in which either the motion to disregard or the motion for mistrial was not raised by trial counsel *and* the reviewing court found no procedural default. Put another way, while a sustained objection may be implied if the trial court instructs the jury to disregard a remark by the State during argument, the defendant must still request a motion for mistrial and have that denied to preserve the issue for appellate review. Likewise, a defendant must give the trial

---

1. For criminal trespass purposes, ownership may be established by proving, beyond a reasonable doubt, that the complainant had a greater right to possession of the property than the defendant. *Arnold v. State,* 867 S.W.2d 378, 379 (Tex.Crim.App.1993).

court the opportunity to cure the allegedly erroneous remark by the State by requesting an instruction to disregard. *See McGinn v. State*, 961 S.W.2d 161 (Tex. Crim.App.1998).[2]

The instant record indicates each of the allegedly improper remarks by the State, if erroneous, would have been curable by a timely and specific instruction to the jury to disregard. Of the various remarks complained of at trial and set out in Thompson's brief, all objections save one were sustained by the trial court. Thereafter, in only two instances did trial counsel follow up with a request to have the jury disregard the remark. In these two instances, Thompson received all of the relief he requested from the trial court. No error is apparent. In the remaining instances, trial counsel either went no further following the trial court's sustaining of the objection, or immediately moved for a mistrial following the sustaining of the objection. Because the error, if any, was curable, failure to request an instruction to disregard waived examination of the issue for appellate purposes. *McGinn*, 961 S.W.2d at 165. The one overruled objection, that the prosecutor referred to evidence not in the record, was properly overruled in the trial court because Thompson did admit evidence that Rozell inaccurately quoted Thompson's sermon. As Thompson either received all relief that was requested and that he was entitled to, or waived review of any alleged error, we overrule issue one.

 Issue two's complaint, that the trial court's written instructions to the jury contained an additional element not contained in the information charging Thompson with criminal trespass, is entirely without merit. The record before us reflects that in the written instructions to the jury, paragraph 1, the abstract definition of the offense in question, does indicate that a person commits criminal trespass if he "enters or remains" on property of another. The information uses only the word "remain" in alleging how Thompson committed the trespass. However, the written instructions to the jury also include the application paragraph, paragraph 4, which clearly restricts Thompson's criminal culpability to "intentionally or knowingly remain" on the property. The word "enters" is completely absent from the application paragraph.

 In *Ramirez v. State*, 967 S.W.2d 919, 922 (Tex.App.—Beaumont 1998, no pet.), we reiterated the law on this issue as follows:

> It is the application paragraph of a jury charge which authorizes conviction, and an abstract charge on a theory of law which is not applied to the facts is insufficient to bring that theory before the jury. *McFarland v. State*, 928 S.W.2d 482, 515 (Tex.Crim.App.1996), *cert. denied*, [519] U.S. [1119], 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). An abstract statement of the law that goes beyond the allegations in the indictment ordinarily will not present reversible error because ordinarily such expansions on the indictment's allegations are effectively restricted by the charge's application of the law to the facts, which limits the jury's deliberations to the allegations in the indictment supported by evidence.

---

2. "[I]f a trial court sustains an objection to improper jury argument, the complaining party must request an instruction to disregard to preserve error on appeal if an instruction to disregard could have cured the prejudice resulting from the argument. [citation omitted]. Requesting a mistrial is insufficient under those circumstances. [citation omitted]. That is so because the appropriate remedy for a curable, erroneous argument to which objection has been sustained is an instruction to disregard. Requesting other forms of relief, such as a mistrial, does not preserve error concerning the absence of an instruction to disregard. If, on the other hand, the prejudice arising from an erroneous jury argument were incurable, a defendant would be required to request a mistrial to preserve error on appeal because a mistrial would be the appropriate remedy. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996)." *McGinn*, 961 S.W.2d at 165.

*Sandig v. State,* 580 S.W.2d 584, 586 (Tex.Crim.App.1979).

In the instant case, the application paragraph clearly limits the jury's consideration to the theory of trespassing (remaining) alleged in the information, and not to the more expansive theory (entering) of which Thompson complains. Issue two is overruled.

■■■■ Issue four attacks the constitutionality of the offense of criminal trespass as applied to Thompson because of the alleged restraint on his freedom of speech and expression. At the outset, we must dispel the impression of Thompson that the premises involved was a "public place." Highland Avenue Baptist Church is clearly private property and therefore considered a "nonpublic forum," regardless of the description of the event in question. A "nonpublic forum" is one which neither by tradition nor government action has become a forum for public communication. *Reed v. State,* 762 S.W.2d 640, 643 (Tex.App.—Texarkana 1988, pet. ref'd) (citing *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). In other words, Highland Avenue Baptist Church is not "an area which by tradition has been devoted to public assembly or debate by the general public." *Reed,* 762 S.W.2d at 644.

■■■■ Speech, in a nonpublic forum, may be restricted so long as the regulations are reasonable and do not attempt to suppress expression because of public officials' opposition to the speaker's views. *Gollinger v. State,* 834 S.W.2d 553, 556 (Tex.App.—Houston [14th Dist.] 1992, no pet.). Based upon the evidence contained in the record before us, the criminal trespass law, as applied to Thompson, was not used to regulate speech. There is simply no evidence in the record before us that Thompson was requested to leave the premises because of the content of any message he was there to express. The purpose of the criminal trespass statute is to regulate *conduct,* not speech. *Otwell v. State,* 850 S.W.2d 815, 818 (Tex.App.—

Fort Worth 1993, pet. ref'd). Although it has been recognized that First Amendment protection goes beyond the spoken or written word, *see Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342, 353 (1989), "[t]he Constitution does not guarantee that those who want to propagandize their views may do so wherever and however they please." *Reed,* 762 S.W.2d at 643. Section 30.05, a general trespass statute, "may be constitutionally applied, even to those who trespass to communicate, so long as it is applied without discrimination and is not used to purposefully suppress speech." *Gibbons v. State,* 775 S.W.2d 790, 794 (Tex.App.—Dallas 1989), pet. ref'd, 815 S.W.2d 739 (Tex.Crim.App.1991) (citing *United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

In the instant case, the evidence indicates that Thompson was asked to leave because he continued to interrupt Rozell's presentation. There is no evidence in the record before us that indicates that Thompson was asked to leave because of the content of any "speech" that he would have presented in some fashion had he been permitted to remain on the premises. He was asked to leave because of his *conduct* in continuing to interrupt Rozell. Because of this, Penal Code Section 30.05, the criminal trespass statute, was not unconstitutionally applied to Thompson. Issue four is overruled.

■■■■ Issue five complains of various "improper remarks" on the part of the State during both direct and cross-examination of Thompson. Contrary to the assertion in his brief, Thompson failed to properly preserve several of the "improper remarks" for appellate review. The first remark called to our attention ("playing games") was not even objected to by trial counsel. Appellate review is therefore waived. TEX.R.APP. P. 33.1(a)(1). The next point in the record at which trial counsel makes an objection, that the prosecutor was suggesting that the defense was

"hiding something,"indicates said objection was never ruled upon by the trial court. The ruling the trial court did make was in regard to the admissibility of the audio portion of one of the video tapes.

█ The next portion of the record we are directed to was the beginning of the State's cross-examination of Thompson. The State's initial question was objected to by trial counsel. The objection was sustained and trial counsel requested an instruction to disregard. The trial court complied with this request. Trial counsel did not move for a mistrial at this point. As was fully discussed in our analysis of issue one above, because trial counsel failed to pursue his objection to an adverse ruling error is not preserved. TEX.R.APP. P. 33.1(a)(2). Review of alleged error was properly preserved, however, to the following questions by the State to which our attention is directed:

Q. Isn't it true—isn't it true that some of the members of your own congregation aren't real happy with the practices of some of these individuals?

. . . .

Q. The individuals that these concerns were addressed at made up a very, very small minority that didn't practice their beliefs with the rest of your congregation?

. . . .

Q. Reverend Thompson, are you with these individuals when they practice—when they practice?

Defense counsel did not state a basis for the objection to the first question he objected to the other two questions based on relevance and relative prejudice. In none of the above instances did Thompson respond before trial counsel interjected his objection. In each instance the jury was instructed to disregard the question. The reporter's record indicates that before the State's first witness was called to testify, the trial court gave the following admonishment to the jury:

Members of the jury, I've already stated to you when you were sitting— seated out in the area as part of the larger panel, the citizen defendant, Reverend Thompson, is charged with the offense of trespassing. It will be your responsibility ultimately to decide whether or not Mr. Thompson is found guilty or not guilty of this offense. But that is the offense, and you have been summoned to pass upon that question.

The morale [sic] and ethical and religious questions that might be entertained into the offense are not a matter that you're supposed to base any decision on. This is not the place where we settle those issues if, indeed, there is a place that it can be settled other than in the hearts of these men and women.

So, I'm telling you and I'm directing you, you are not to take into consideration these extraneous matters. Your responsibility is to pass upon the innocence or guilt of the defendant as it relates to the charge that has been filed against him.

Now, I will grant both the State and the defense some latitude that might touch upon these areas. I do that because every citizen is entitled to his day in court. The State is entitled to its day, and the citizen defendant is entitled to his. But that is the only reason I will let these extraneous matters approach your ears. I'm directing you to base your judgment upon the evidence that has come from this stand as it relates to the question of the innocence or guilt of the defendant.

Based upon the very explicit admonishment set out above and the immediate instruction to disregard the State's questions because of their obvious reference to possible religious practices of Thompson or of people with whom he was acquainted, any error attached to said questions was cured. Issue five is overruled.

█ Thompson's final issue, issue six, contends that the trial court erred in denying a motion to quash the information

for failure to give adequate notice so as to enable the accused to prepare a defense and prevent double jeopardy. Specifically, Thompson complains that the information (1) failed to specify what notice Thompson received to depart, and (2) failed to include a description of the real property where the trespass occurred. With regard to the lack of a description of the real property where the trespass took place, we initially note that the exact location of the property in question is not an essential element of the offense of criminal trespass. *Reed,* 762 S.W.2d at 645. Even if exact location was necessary for notice purposes, its omission is not reversible error unless it had an impact on Thompson's ability to prepare his defense. *Id.* In the instant case, Thompson's motion to quash recited the exact address of the property. Also, attached to the motion to quash was a copy of the complaint filed by the arresting officer which lists the "location" as "140 E. Threadneedle—Highland Baptist Church." Thompson was well aware of the specific location of the premises where the trespass took place.

As for the need to detail in the information the type of notice to depart given to Thompson, he has provided us with no authority, and we have found none, categorically requiring the State to allege which of the enumerated methods of "notice" set out in Penal Code Section 30.05(b)(2) were used. *See Bobo v. State,* 757 S.W.2d 58, 61 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). If Thompson is complaining that the information should have listed the name of the individual or individuals who asked him to leave the premises and the exact words used, it is axiomatic that the State need not plead evidentiary facts. *See Moreno v. State,* 721 S.W.2d 295, 300 (Tex.Crim.App.1986); *Thomas v. State,* 621 S.W.2d 158, 161 (Tex. Crim.App.1981). Absolute factual allegations need not be set forth in the charging instrument. *Wilson v. State,* 825 S.W.2d 155, 159 (Tex.App.—Dallas 1992, pet. ref'd). We find, therefore, no error on the

part of the trial court in denying Thompson's motion to quash the information. Said information provided sufficient notice to Thompson so as to enable him to prepare his defense as well as act as a bar to future prosecution for the same offense. Issue six is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

EARL B. STOVER, Justice, concurring.

Without question, this is a problematic case. On the one hand, the Rev. Thompson contends that he was set-up. On the other hand, the State contends appellant, in effect, was seeking to make some sort of "statement" through his actions that night. Regrettably, there appears to be some truth to both contentions. Not wanting to be diverted along either of those paths, the sage trial judge admonished the jury to stay focused on the issue at hand—namely whether the State proved appellant committed the offense of trespass. We are not, as the jury was not, called upon to decide the merits of conflicting or competing religious points of view.

We review the legal sufficiency point of error herein under a well-established standard of appellate review, which has been ably set forth in the majority opinion. For the purpose of my analysis, I emphasize certain aspects of that standard. As noted in the majority opinion, all of the evidence must be examined in the light most favorable to the jury's verdict. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). As the trier of fact, the jury is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *See* Tex.Code Crim. Proc. Ann. art 38.04 (Vernon 1979); *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981). It is for the jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. *Bowden v. State,* 628 S.W.2d 782, 784–85 (Tex.Crim. App.1982). Even where there is no conflict, the jury may elect to give no weight

to some evidence, and thereby reject part or all of a witness's testimony. *See Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *see also Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim. App.1991) (holding jury as factfinder may "believe all, some, or none of the testimony"). Because it is within the province of the jury to weigh the testimony, any inconsistencies therein should be resolved in favor of the jury's verdict in a legal sufficiency review. *See Johnson v. State*, 815 S.W.2d 707, 712 (Tex.Crim.App.1991) (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988)).

The record in this case includes not only the witnesses' testimony at trial, but also two video tapes admitted into evidence and viewed by the jury. The video tapes were made of the meeting that night by two different cameras from different angles. In addition to the audio portion of the meeting, the videos also contain, as described in the majority opinion, views of the inaudible exchange between Rev. Thompson and Officer Tatum. Thus, the jury had before it the trial testimony of Thompson and Tatum regarding what was said and done during that interchange, as well as the video tape on which the audio portion of their interchange is silent.

I am satisfied that body language, such as that contained in the video tape exchange between Rev. Thompson and Tatum, is recognizable as a non-verbal means of communication and may be considered by the jury in an evaluation of the credibility of witnesses. As Justice Bleil noted in his concurring opinion in *Skidmore v. State*, 838 S.W.2d 748, 757 (Tex.App.— Texarkana 1992, pet. ref.), "It has been posited that ten percent of spoken communication is by the words we say, thirty percent by the sounds we make and sixty percent by body language, or nonverbal communication. *See* STEPHEN R. COVEY, THE SEVEN HABITS OF HIGHLY EFFECTIVE PEOPLE 241 (1989)."

By his presence that night, Rev. Thompson accepted the general invitation to attend the seminar. He indicated he had received a written hand-out of the evening's program in which a question and answer session was listed as part of the meeting. Although he acknowledged receipt of the written material, he took exception to what he perceived to be Rev. Rozell's oral alteration of the rules to require that the questions be in writing. Rozell testified that the meeting "was not a public debate"; however, written questions were allowed, and pencils and paper were provided for that purpose. Pam Saur, one of appellant's church members, confirmed that Rev. Rozell explained the "ground rules" of the meeting. Notwithstanding the clarity of the instructions, Rev. Thompson interrupted the seminar when he took exception to the fact that Rev. Rozell referred to him as "Mr. Thompson" rather than "Reverend Thompson." Shortly thereafter, Rev. Thompson again interrupted Rozell's remarks by audibly challenging one of Rozell's statements.

Once Rozell asked that Thompson be removed from the meeting, Tatum moved from his position at the back of the room and up the aisle to where Thompson was seated. The jury viewed on video tape the inaudible interchange between Rev. Thompson and Tatum and, as we know from the guilty verdict, must have concluded that Rev. Thompson was on notice to depart, but refused to do so. Such a conclusion could have been based on Thompson's action, after Tatum spoke to him, in gathering up his belongings as if to leave, and then his action a moment later in making no attempt to stand when the officer appeared to attempt to assist him in getting up. His conduct, as viewed on the video tape, supports the conclusion that he had been asked to leave, declined the opportunity to do so, and instead chose to stand on principle.

To quote an old maxim, Rev. Thompson's "actions speak louder than words." From Thompson's testimony and his actions, as recorded on video tape, the jury could have concluded he knew he had been

asked to leave. Even Thompson's statement to Rozell that "I'd like to see you try [to remove me]" belies any suggestion that he did not understand he had been asked to leave. Furthermore, Thompson expressly stated at one point in his trial testimony that Tatum leaned over and whispered in his [Thompson's] ear that Rozelle wanted him [Thompson] to leave.

As noted above, credibility of the witnesses is a matter for the fact finder, be it judge or jury. Similar to the use of video tapes in DWI arrests, probable cause stops, and shoplifting and robbery offenses, the video tapes in the instant case aided the jury in the determination of guilt or innocence. The video tapes clearly depict the demeanor and body language of Rev. Thompson during his attendance at the seminar. In addition to the video tapes, the members of the jury had before them the testimony of Thompson, Rozell, and Tatum. The jury was free to interpret the verbal, as well as non-verbal communication accordingly.

I believe Rev. Thompson was seeking to make a statement through his conduct; he paid a significant price for his "statement" by virtue of his having been arrested and convicted of a criminal offense. In my opinion, appellant has achieved exactly what he embarked upon when he attended the seminar. His demeanor, as recorded on video tape, along with the testimony of various witnesses at trial, reveals his intended course of conduct. Admittedly in this country, we need people who will stand up for a principle; however, in making such a stand, a person must be able to accept the consequences.[1]

Rev. Thompson was not denied admission to the meeting, but, as a result of his actions therein, he was removed from the premises. In my view, a rational trier of fact could have found the essential elements of the offense of trespass beyond a reasonable doubt. After considering the evidence—presented in both verbal and non-verbal form, the jury could have concluded that appellant had notice he had been asked to leave the premises, and he refused to do so. I am satisfied that the evidence was legally sufficient to support the conviction, and I concur in affirmance of the conviction.

DON BURGESS, Justice, dissenting.

I respectfully dissent. For our purposes and as set forth in the application paragraph of the jury charge, the elements of criminal trespass are:

a. intentionally or knowingly remain on the property of another

b. without the effective consent of that person

c. after receiving notice to depart, and

d. failing to depart.

The issue before this court is the sufficiency of the evidence on the notice to depart requirement. Often times, what appear to be complex cases, become quite simple ones when viewed in context. I begin my review with testimony from Detective Tatum, describing a conversation with Reverend Rozell.

[PROSECUTOR]: Okay. Without telling us exactly what was said, what was your understanding from talking to him as to what would be your law enforcement role while you were there?

[WITNESS]: Well I don't know if it were specifically intended for me but it was mentioned that he was afraid that there would be a disruption.

[PROSECUTOR]: Okay. Can you tell the Court anything more than that about—without—can you be more precise?

---

1. I quote a remark which has been attributed to Theodore Roosevelt in his third annual message to Congress in 1903: "No man is above the law and no man is below it; nor do we ask any man's permission when we require him to obey it. Obedience to the law is demanded as a right; not asked for as a favor." John Bartlett, Familiar Quotations: A Collection of Passages, Phrases And Proverbs Traced to Their Sources In Ancient And Modern Literature 687 (Emily Morrison Beck et al. eds., Little, Brown and Company 1980).

[WITNESS]: Well, he stated that if there—if there was a disruption that he could not quell that he would ask the person to leave and if they would not leave, he would ask that they be removed.

Clearly Reverend Rozell had a correct understanding of what was required under the criminal trespass statute: the person would be asked to leave and if they did not, then they would be removed. So, what was the sequence of events? Again the testimony; first, Reverend Rozell, on direct examination:

[WITNESS]: I told him if he interrupts again he would be removed from the church.

[PROSECUTOR]: Okay. What happened after that?

[WITNESS]: His response was "I'd like to see you try."

[PROSECUTOR]: And then what happened?

[WITNESS]: I asked for the—well, I didn't really ask—I just said, "I would like for him to be removed."

[PROSECUTOR]: Okay. And at that point did the law enforcement respond?

[WITNESS]: Yes.

Next, Reverend Rozell, on cross-examination:

[DEFENSE COUNSEL]: And you never used the words please leave or leave, did you?

[WITNESS]: No, I did not.

[DEFENSE COUNSEL]: You never told Reverend Thompson directly to depart, did you?

[WITNESS]: No, sir, I did not.

Then, Detective Tatum's recollection of Reverend Rozell's remarks:

[PROSECUTOR]: Okay. And did Reverend Rozell say anything at that point that you could hear?

[WITNESS]: Reverend Rozell asked him to leave.

[PROSECUTOR]: Okay. Do you remember his words?

[WITNESS]: I think he asked that he be removed.

Finally, Reverend Thompson's account of Reverend Rozell's remarks:

[DEFENSE COUNSEL]: Now, what did Reverend Rozell say in response to that?

[WITNESS]: When I said, "I don't know where you got that, but you didn't get it from me." He said, "Another interruption and you'll be removed."

. . . .

[DEFENSE COUNSEL]: What did you say in response?

[WITNESS]: I said, "I'd like to see you try."

. . . .

[DEFENSE COUNSEL]: Now, did Reverend Rozell ever ask you directly to leave?

[WITNESS]: I was not asked politely or in any other fashion to leave.

[DEFENSE COUNSEL]: You respect the church property?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: I mean, would you have left if it had been clear to you to leave?

[DEFENDANT]: If I had been asked in a polite manner, I probably would have left.

[DEFENSE COUNSEL]: Well, just asked—how about if you were just asked—whether it's polite or not, but asked in a clear and definite manner to leave?

[DEFENDANT]: Again, I probably would have left.

[DEFENSE COUNSEL]: Now, when he said, "I'd like to see him removed," what happened next?

[DEFENDANT]: He just gestured with his hand and said, "I'd like to see him removed." He did not ask me to leave, and so I'm sitting there waiting to see what happens next. I—at that point I really did not know if he was serious.

The whole thing was so ridiculous, I was astonished, outraged, all at the same time. I just really could not believe that he would do that.

. . . .

[PROSECUTOR]: Reverend, I really skipped over the most important part of this trial. When Officer Tatum came up to you—when you first heard Reverend Rozell—

[DEFENSE COUNSEL]: Objection, beyond the scope of redirect, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: When you first heard Reverend Rozell say, "If you interrupt me again, you'll be removed," or something to that effect, did you hear him?

[DEFENDANT]: Yes, I heard him.

[PROSECUTOR]: Did you understand him?

[DEFENDANT]: I wasn't sure exactly what he meant.

[PROSECUTOR]: Pass the witness.

Again, simplicity at its finest. The prosecutor recognized "the most important part of this trial" had to do with Reverend Rozell's comments about removal. Clearly, Reverend Rozell never asked Reverend Thompson to leave nor gave Reverend Thompson any notice to depart. Upon the interruption by Reverend Thompson, Reverend Rozell summarily ordered Reverend Thompson removed. Therefore, the conviction cannot be upheld on any purported notice to depart to Reverend Thompson by Reverend Rozell.

However, the statute does allow for the notice to depart to be given by someone with apparent authority to act for the owner. The majority says Detective Tatum fulfills this requirement. Again, an examination of the testimony. First, Detective Tatum, on direct examination:

[PROSECUTOR]: Did you—you said you heard the Reverend Rozell ask him to leave?

[WITNESS]: Yes, sir.

[PROSECUTOR]: In different words. Did you also ask him to leave?

[WITNESS]: Yes, sir.

[PROSECUTOR]: How did you say that?

[WITNESS]: Well, I—I did not ask him to leave. I explained to him that if—if the Reverend Rozell asked him to leave, that he had to leave, that he didn't have a choice, that he did not—

[PROSECUTOR]: So, you reiterated—

[WITNESS]: Yes, sir.

[PROSECUTOR]:—what Reverend Rozell had said.

Then, Reverend Thompson's account of the conversation with Detective Tatum:

[DEFENSE COUNSEL]: Now, are you able to testify what was said between that officer and you as he's leaning over your left shoulder?

[DEFENDANT]: Yes. He whispered to me and I whispered in response, but I can't testify to you precisely what was said.[1]

[DEFENSE COUNSEL]: And how can you do that?

[DEFENDANT]: I had my pocket tape recorder sitting on the pew by my side, and it picked it all up.

[DEFENSE COUNSEL]: And do you remember it, as well?

[DEFENDANT]: As well, yes.

[DEFENSE COUNSEL]: What did he say?

[DEFENDANT]: He leaned over and whispered in my ear, "Mr. Thompson, he wants you to leave."

[DEFENSE COUNSEL]: What did you say in response?

[DEFENDANT]: I said, "This is a public meeting."

1. From context, it appears the record should be: "... but I *can* testify to you precisely what was said."

. . . .

[DEFENSE COUNSEL]: Now, at this point had—did Reverend Rozell say anything else asking you to leave?

[DEFENDANT]: No. He was too busy singing Victory in Jesus.

[DEFENSE COUNSEL]: Is the answer no to that?

[DEFENDANT]: The answer is no.

[DEFENSE COUNSEL]: After you said that you were a part of the public, what did the gentleman say after that?

[DEFENDANT]: He said, "He asked you to leave. The main reason is you're trespassing."

[DEFENSE COUNSEL]: And then did he say anything about—

[DEFENDANT]: He said, "He asked you to leave. The main reason is you're trespassing, and that's not necessary."

[DEFENSE COUNSEL]: Now, what did you understand when he said, "It's not necessary?"

[DEFENDANT]: Now necessary for me to remain in the seminar, to remain to see what would happen next in the seminar.

[DEFENSE COUNSEL]: Now, did you pack up your bags?

[DEFENDANT]: Well, he then said—

[DEFENSE COUNSEL]: Did you pack up your bags?

[DEFENDANT]: Yes, I did.

[DEFENSE COUNSEL]: And I think that was shown on the tape, as well?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Did you have—what kind of a briefcase did you have?

[DEFENDANT]: A zippered attache' case.

[DEFENSE COUNSEL]: Did you put your things in your attache' case?

[DEFENDANT]: Yes, I did.

[DEFENSE COUNSEL]: And they what did you do?

[DEFENDANT]: I waited for further instructions.

[DEFENSE COUNSEL]: Do you remember on the tape when you sat back down?

[DEFENDANT]: Well, I never stood up.

[DEFENSE COUNSEL]: That's—you know, I picked that up yesterday. Of course, you never stood up, did you?

[DEFENDANT]: No.

[DEFENSE COUNSEL]: So, you remained seated?

[DEFENDANT]: (Nodding).

[DEFENSE COUNSEL]: And waited for further instructions. Did you cross your legs?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Why did you do that?

[DEFENDANT]: Reflex. That was a position I had been sitting in previously, and I simply returned to my previous body posture waiting to see what would happen next.

[DEFENSE COUNSEL]: If you had been told to exit this way or that way, would you have done it?

[DEFENDANT]: I think so.

Again, a simplistic analysis of the exchange between Detective Tatum and Reverend Thompson reveals that Detective Tatum was only reiterating what Reverend Rozell had said. Although Detective Tatum initially said he had also asked Reverend Thompson to leave, Detective Tatum quickly corrected himself and noted that he did not ask Reverend Thompson to leave, but "explained to him that if—if the Reverend Rozell asked him to leave, that he had to leave, that he didn't have a choice." Thus, the purported notice to depart by Detective Tatum was dependent upon notice to depart given by Reverend Rozell, not by any separate, independent notice by Detective Tatum.

Each of these published cases indicate a clear request or notice to leave and, in

many cases, an additional notice that failure to leave would result in criminal charges. *Bustillos v. State*, 832 S.W.2d 668, 672 (Tex.App.—El Paso 1992, pet. ref'd)("The record clearly indicates that the protestors were repeatedly asked to leave and were told that their failure to do so would result in arrests and the filing of criminal charges."). In *Reed v. State*, 762 S.W.2d 640, 643 (Tex.App.—Texarkana 1988, pet. ref'd)

> [H]e informed the leader of the group that the sidewalk was private property and asked them to leave. They refused and Elliott threatened to call the police. When they still refused, Elliott called the police. When the police arrived, they explained the law of criminal trespass to them and asked them to leave. When they again refused, they were arrested....

*Gollinger v. State*, 834 S.W.2d 553, 557 (Tex.App.—Houston [14th Dist.] 1992, no pet.), provides:

> In this case, the appellant himself testified that Franks asked him to leave and he refused. Franks testified that he asked appellant to leave at least three times before telling appellant he was going to call the police. Each time he was asked to leave, appellant responded that he had a right to be there and refused to leave the premises.

In *Zarsky v. State*, 827 S.W.2d 408, 414 (Tex.App.—Corpus Christi 1992, pet. ref'd):

> On the morning of appellant's arrest, Hopkins approached appellant, identified himself and requested that appellant leave the property. Hopkins testified that he had the authority to take care of the property; appellant, in his testimony, acknowledged that Hopkins had the authority to ask him to leave....
>
> We find this evidence sufficient to sustain the conviction. Appellant was not prosecuted for entering the property. He was prosecuted for remaining on the property after being notified to leave.

In *Olaniyi–Oke v. State*, 827 S.W.2d 537 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd):

> [A]ppellant entered the first floor of the Harris County jail and approached the master control center, where Harris County Deputy Gary Davis was on duty.... Appellant handed Davis fragments of a Texas driver's license. Davis informed appellant that the identification was unacceptable, and denied appellant access to the upper portion of the jail.
>
> Appellant became angry, and Davis asked him to leave the premises. Appellant did not leave, and Davis arrested appellant for the offense of criminal trespass.

In *Felker v. State*, 819 S.W.2d 636, 637 (Tex.App.—Corpus Christi 1991, no pet.):

> Ms. Van Holsbeck called Gene Lorenz, property manager of the International Plaza, the building which housed the office. He told them that Ms. Van Holsbeck had to close the office for lunch, and he asked them to leave and come back at 1:00. He gave them consent to stay in the building between 12:00 and 1:00, but he did not give them consent to stay in Congressman Ortiz' office during that time period. They still refused to leave the office. A Brownsville police officer, Larry Ferrar, told them that Ms. Van Holsbeck wanted to go to lunch and asked them to leave. He told them that if they did not leave, they would be arrested. They refused to leave and were arrested.

In *Moses v. State*, 814 S.W.2d 437, 443 (Tex.App.—Austin 1991, pet. ref'd, untimely filed):

> LaFayette gave warnings at the front and back doors of the clinic. She asked the people to leave and advised them if they did not leave that they would be trespassing....
>
> Austin Police Lieutenant Stewart testified that appellant 'was in front of the crowd of persons that was blocking the

doorway.' Stewart, at LaFayette's request, advised the crowd that they had been warned to leave and not come back, that they were in violation of the criminal trespass statute, and, if they continued to remain on the premises, that they would be subject to arrest.

Incredibly, the concurrence states "the jury could have concluded he knew he had been asked to leave." This is based upon Thompson's body language in the video tape. This conclusion, if made by the jury, is certainly not supported by the evidence. Detective Tatum unequivocally stated he did *not* ask Thompson to leave.

In summary, Reverend Rozell shortcut the legal requirements of the statute and had Reverend Thompson removed without giving Reverend Thompson notice to depart. No doubt, some will scream "technicality," but their complaint must be lodged with the legislature. The statute, in my view, does not criminalize mere presence or disruption, it only criminalizes remaining on the premises after receiving notice to depart and then failing to do so. Clearly, the legislature intended that a potential trespasser be given the opportunity to avoid criminal consequences, by placing the notice requirement in the statute. As outlined above, Reverend Thompson did not receive any notice that unless he departed he would be charged with a criminal offense. The only notice he received was that if he interrupted again, he would be removed; this was not sufficient. Therefore, I would reverse the judgment and order an acquittal.