**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00189-CR**
_____

**SEAN LAVERGNE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 18-28631**
_____

**MEMORANDUM OPINION**

A grand jury indicted Sean Lavergne (Lavergne) for "intentionally and knowingly caus[ing] the death of . . . [R.J.], . . . the Complainant, by physical assault by means unknown to the Grand Jury[.]"[1] A jury found Lavergne guilty of the murder. *See* Tex. Penal Code Ann. § 19.02(b)(1). Lavergne pleaded true to the

---

[1] We identify the victim by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

enhancement portion of the indictment, and the trial court sentenced Lavergne to seventy-five years of confinement. Lavergne timely filed a notice of appeal. In five issues, Lavergne challenges the legal sufficiency of the evidence supporting the jury's verdict, the trial court's denial of Lavergne's motion for directed verdict, and the jury charge. As modified, we affirm the trial court's judgment.

Evidence at Trial

Testimony of Brandy Dyson

Brandy Dyson, a crime scene technician with the Beaumont Police Department, testified that she was called out to the scene on Angelina Street on September 12, 2015, and when Dyson arrived, EMS was already there. According to Dyson, she was advised that it was a potential homicide and arson, and she observed a kicked-in front door to an apartment and there was the body of a deceased female lying in the front living area. Dyson testified that the apartment "was in disarray[,]" and there was a strong odor of smoke and soot throughout the apartment. She testified that R.J., the deceased, was found lying on the floor nude with burn injuries and blood on her face. Dyson testified that it appeared there had been a struggle in the apartment and that there also appeared to be blood on a bathroom faucet. Dyson testified that another crime scene technician was with her and the technician collected swabs at the scene to be sent to the lab for testing. Dyson

2

processed a nail polish remover bottle and an iPhone with silver fingerprint powder, but no fingerprints could be lifted from the items. According to Dyson she was called back out to the scene to photograph and collect clothing that R.J. had been wearing the previous night, which had been found in the upstairs bathroom on the counter. Dyson testified that she took photos and a video of the scene, and the photos and video were admitted into evidence and published to the jury.

Testimony of Daniel Workman

Daniel Workman, a City of Beaumont paramedic, testified that he was dispatched to the scene for "a cardiac arrest call." When he arrived, dispatch advised that "this had potential to be a crime scene[.]" Workman noticed an adult male walking around from the rear of the complex. According to Workman, the man walked erratically in circles and walked to an individual next door while ignoring Workman's questions. Workman testified that the man appeared to exhibit abnormal behavior as if possibly on drugs, and the man began kicking the front door of the apartment until it flew open, and smoke began protruding through the front door "almost like the house was on fire[.]" Workman said the man then began yelling. The fire department then arrived, entered the residence, and told Workman they found an adult female victim that had apparently been "lit on fire." The victim was

3

pronounced dead at the scene, and the body was turned over to the police and the JP for an investigation.

Testimony of Detective Tarah Mireles

Detective Tarah Mireles with the Beaumont Police Department testified that she was on patrol and was dispatched to the scene to assist EMS. When she arrived, she observed a Beaumont EMS medical unit parked near a duplex and the Beaumont EMS personnel were standing in the roadway. Detective Mireles testified that there were two points of entry into the apartment, a front door and a sliding glass door on the backside of the duplex. According to Detective Mireles, the Defendant, Lavergne, was at the scene "jumping around the front yard acting very erratic[]" and saying someone was inside the residence, and the EMS personnel explained to Mireles that they could not proceed to the house until Lavergne was detained. Detective Mireles testified that Lavergne's behavior was not consistent with behaviors she normally observed from a friend or family member of a person that called in that might be in distress or need help from the police department or EMS, but his behavior was consistent with someone on PCP, synthetic marijuana, or "stuff like that."

Detective Mireles testified that she and another officer approached Lavergne and ordered him to "[g]et on the ground." According to Detective Mireles, after

4

Lavergne was handcuffed the other officer and Lavergne began moving away from the house while Detective Mireles proceeded to the kicked-in front door. Detective Mireles testified that as smoke was coming out, Mireles yelled back to Lavergne, "[w]here is she" because Mireles could not see anything in the house in front of her. Detective Mireles testified that Lavergne yelled back, "[s]he's right there. She's right there[,]" and Detective Mireles attempted to enter the residence. Once inside the residence, Detective Mireles had difficulty breathing and seeing, and had to step out. Detective Mireles testified she went back inside the apartment and "continue[d] in until [she] almost tripped over [the victim] in the middle of the floor." According to Detective Mireles, she believed Lavergne had been in the residence before the fire started and before the police arrived because he knew where the body was located, and Mireles could not see once inside the house because of the smoke.

Detective Mireles testified she found R.J.'s burned body, and "[t]here was some form of paper on her stomach and then on the floor beside her . . . [t]hat seemed to be the source of where the fire was coming from." According to Detective Mireles, R.J. had blood on her right hand, fingers, on the opening of her nostrils, and on the edge of her nose. R.J. also had scratches to her face, some superficial and two deeper scratches that were still bleeding when Mireles found the body. Mireles called her supervisor due to the suspicious nature of the scene. Mireles testified she found

5

R.J.'s cell phone inside the residence. Later when Mireles went out in back of the apartment, she found an orange shirt on a chair, and a cell phone in several pieces which appeared to be a broken "flip phone" with a battery and the back of the flip phone "all separate laying on the ground" outside the back door.

Testimony of Antoinette Young

Antoinette Young testified that she was in a relationship with Eric Fontenot and arrived at his house on Angelina around 6 or 7 p.m. the night of September 11, 2015. Young testified she watched television and listened to music until he came home from work about 1 a.m. According to Young, while she waited for Fontenot to get home, she heard R.J. and Lavergne arguing in the duplex unit that shared a wall with Fontenot's unit. Young testified that the couple argued for hours, the arguing began before Fontenot arrived home and continued until after he arrived home at 1 a.m. and until 5 or 6 a.m., and Young heard the door slamming and what sounded like furniture being moved. Young testified that around 4 or 5 a.m., when she had started "dozing off[,]" she thought she heard R.J. say, "Sean, you're going to hurt me. You're going to kill me." Young testified that earlier in the evening she heard R.J. talking to a female in the duplex but Young did not know how long the female stayed. According to Young, around 8 or 9 a.m., Lavergne knocked on Fontenot's door, Fontenot answered the door, and Lavergne was acting "nervous

6

calm[]" which she described as meaning "[h]e wasn't really reacting" but he was almost "flat[.]" According to Young, Lavergne asked for someone to call 911 because he said something was wrong with R.J. Young called 911, gave the phone to Lavergne, and Young did not hear the conversation because Lavergne walked off and she walked back in the house. Young did not remember talking to Mireles at the scene.

Testimony of Gloria Berry

Gloria Berry testified that she became friends with R.J. after Gloria drove R.J. to and from work for Berry's friend's taxi service a few months before R.J.'s death. According to Berry, her "first time hanging out with [R.J.] and her boyfriend[]" was when R.J. called her on September 11th and invited Berry and a friend to "hang out" that day because it was Berry's friend's birthday. Berry testified that early that afternoon, she, her friend, R.J., and Lavergne played dominoes, drank alcohol, and did drugs at Berry's house. Berry admitted to drinking alcohol and taking Ecstasy pills, but she testified that she did not do cocaine that night but that "they were on their cocaine and stuff like that." Berry testified that she did not see anything out of the ordinary, just that Lavergne had "a little jealous streak[,]" and that when she went to R.J.'s apartment later, R.J. and Lavergne "kind of had a few words[]" but were not really arguing. She testified that she and her friend left R.J.'s apartment

7

about 3 a.m. because Berry's friend felt uncomfortable and Lavergne kept his back turned to them the whole time, that R.J. was sitting on the sofa polishing her toenails and had a big bag of polish dumped out, and when Berry and her friend left, Lavergne and R.J. were the only two at R.J.'s apartment.

According to Berry, when Berry arrived home around 3:15 a.m., she texted R.J. and R.J. responded "okay[.]" Berry testified that later that morning, around 4 a.m., R.J. texted again stating that she had a good time but Berry was sleeping and did not get the text until she woke up. Berry testified that she also tried to call R.J. around 9 or 10 a.m., but R.J. did not answer. Berry stated that she was not worried when R.J. did not answer because she believed R.J. was still sleeping, but later Berry learned R.J. was deceased. According to Berry, she went to the crime scene and ultimately gave a statement to law enforcement. Berry testified that although in her statement to law enforcement she stated that "Jay" came over that night and sold them cocaine, she stated that she did not remember someone named "Jay" coming over and selling them drugs. She also acknowledged that she said in her statement that she did not feel like Lavergne was acting weird that night, but she told the jury that she "thought maybe he was just high, . . . but he's weird, period."

8

<u>Testimony of Eric Fontenot</u>

Eric Fontenot testified that in 2015 he lived in an apartment that was "like a townhome[]" on Angelina and on the other side of Fontenot's home was an apartment occupied by R.J. According to Fontenot, R.J.'s sister moved to Houston and when Lavergne and R.J. began dating, Lavergne then moved in with R.J. Fontenot testified that R.J. and Lavergne were acquaintances of his and that because R.J. had been his neighbor for a while, they "knew each other pretty good." According to Fontenot, he got home from work about 1 a.m. on September 12, 2015, and Fontenot's girlfriend, Young, was at his home. Fontenot testified he could tell that Lavergne and R.J. had company over that evening, but Fontenot did not recognize the guests. Fontenot testified that music was playing next door when he arrived home and that a short time afterwards "[i]t sounded like there was some arguing that had started; and people, I guess, felt uncomfortable [and] started leaving." Fontenot testified that it sounded like Lavergne and R.J. were the people arguing that night as they often did, and the arguing that night lasted for hours, until around 6 a.m. Fontenot testified that he heard, "Get your hands off me[,]" name calling, and maybe a physical confrontation or furniture being moved around.

Fontenot testified that around 10 a.m., he was awakened by a knock at his apartment front door. He did not answer the front door, but when he heard knocks at

9

his back door he answered because he knew something must be wrong as typically no one knocked at his back door because the backyard was gated. When he answered the back door, Lavergne was at the door saying there was an emergency and to call 911. According to Fontenot, by the time he handed Young's phone to Lavergne, Lavergne had another phone in his hand and "in the midst of him talking to paramedics or whoever he was on the phone with . . . [Lavergne] . . . dropped the 'F' bomb and he threw the [other] phone down on the concrete." Fontenot testified that Lavergne called 911 using Young's phone, and he said "[o]h, hell no" and hung up. In a second call, Fontenot gave the operator the correct address and then gave the phone back to Lavergne. Fontenot testified that while Lavergne was on the phone with 911, the sliding back patio door to Lavergne and R.J.'s apartment was open and Lavergne could have walked in if he had wanted to. Fontenot testified he asked Lavergne where R.J. was, and Lavergne "shrugged it off while he was on the phone." Fontenot testified he saw smoke coming out of the house onto the back porch, he saw R.J. on the floor, and he "freaked out" and went and told his girlfriend what he had seen. Fontenot testified he opened his front door when the paramedics and law enforcement arrived, and he observed Lavergne walk from the side of the house and around the front. According to Fontenot, Lavergne then said, "Oh, my God. Eric, my girlfriend is in the apartment. Help me open up the door."

10

Fontenot testified that Lavergne started kicking in the front door even though the back door was wide open. Fontenot testified that the paramedics did not approach the apartment because of Lavergne's "frantic" behavior, and law enforcement ultimately detained Lavergne so the paramedics could respond. Fontenot agreed that, based on the difference in Lavergne's behavior when he was at Fontenot's door and when the paramedics and law enforcement arrived, it appeared as if Lavergne "was putting on a show[.]" When asked at trial what Fontenot thought at the time he observed Lavergne kicking in the door, Fontenot testified:

> Well, at the time, honestly, when he did that, that's what made me feel like he had hurt [R.J.] because we - - like I said, we [were] just standing on the back porch with the door open, like, there was no need for you to, you know - - you had to go out a gate, through a parking lot, up the street and around a corner to come to the front door. You know, . . . the back door was slid open. He could have just [gone] through the apartment and opened up his own front door. And then . . . he . . . acted like he just got to the apartment.

Fontenot testified that he did not tell law enforcement at the scene that he thought something bad had happened to R.J. because law enforcement was "already in the apartment doing their job[] . . . [and] didn't feel the need to tell them the obvious because they were already in there." Fontenot testified that he and Young subsequently provided statements to a homicide detective and a representative from the fire station regarding what had happened. On cross-examination, Fontenot did not deny that he told a female officer at the scene that he did not hear anything that

11

night, but he testified at trial that he did not remember telling the officer that and he only remembered asking the officer if R.J. was okay.

Testimony of Constable Earl White

Jefferson County Constable Earl White testified that in 2015, prior to being elected constable, he was a captain and fire investigator for the Beaumont Fire Department. White testified that once he arrived at the scene, he was advised by fire personnel that they had discovered a deceased black female within the apartment. According to White, the smoke had dissipated by the time he arrived and as he entered the apartment, he observed the body of a nude, black female lying on her back, and the body had sustained fire damage. White testified that there was toilet paper unburned and burned on the body of the deceased that indicated to him that it had been placed there by someone. White explained that it appeared that the fire was intentionally set and that the toilet paper was used to cause the fire to spread. Photographs of the scene were admitted into evidence and published to the jury. White testified that the apartment "appeared to be in disarray, like there had been some type of disturbance[.]" White collected a sample of carpet and padding from underneath the deceased and sent it to the lab for analysis. White testified that the lab analysis revealed that gasoline was chromatically detected from the sample. White testified that he did not see any gas cans or gasoline at the crime scene.

According to White, he was called later the same day to the Beaumont Police Department to see if there was a presence of flammable liquids on Lavergne, but the hydrocarbon detector White used did not reveal any readings for the presence of flammable liquids. White explained that he did not test Lavergne at the scene. According to White, if someone with flammable liquids on their person washed with soap and water or changed clothes, those actions could remove the detectible remnants of the flammable liquids, and White could not account for Lavergne's movements prior to testing him at the police department. As a result of his investigation, White concluded that the fire did not appear to be accidental but that "[s]omeone intentionally set the fire with the motive of damage, destroy the property or to cover up evidence."

Testimony of Dr. Wayne

Dr. Wayne, a forensic pathologist with Forensic Medical Management Services of Texas, testified that he performed an autopsy on R.J. According to Dr. Wayne, he opined that R.J.'s cause of death was homicide and that there was "homicidal violence due to physical assault." Dr. Wayne testified that he identified four broad types of injury patterns on R.J.: (1) an element of physical assault or blunt force injury; (2) an element of thermal injury, or burns to almost forty percent of her body; (3) stab and incised wounds on her body; and (4) injuries in her eyes that

13

suggest some type of pressure or compression on the neck or thoracic or chest cavity.

Dr. Wayne testified as follows regarding his conclusion about R.J.'s cause of death:

> My assurety [sic] about her cause of death is when I review her autopsy and I look at the multiple injury patterns that she sustained, I am confident that either one by itself or a combination of all of them killed her. I just can't tell you which exact one did it at which precise time.

Dr. Wayne noted that toxicology testing identified the presence of alcohol, Alprazolam, cocaine, and metabolites of cocaine, but none of those caused her death. Dr. Wayne testified that he did not find any defensive wounds on R.J., and that it is uncommon for him to find defensive wounds on people when performing autopsies.

Testimony of Aaron Lewallen

Detective Aaron Lewallen with the Beaumont Police Department testified that he was called to the scene on September 12, 2015. Detective Lewallen testified that Officer Mireles told him that when she had entered the residence the smoke was so thick that she could not see anything. Detective Lewallen noted an unopened fire extinguisher at the scene because "there was a fire at the scene, and I just thought the fire extinguisher might have been useful." According to Detective Lewallen, the front door of the apartment had been forced open and the apartment was "[i]n a general state of disarray." Detective Lewallen testified that based on R.J.'s bleeding, blood and broken glass in the kitchen, and the state of the apartment in general, he

14

believed a struggle had taken place. Detective Lewallen testified that he noted that there was a broken phone on the back patio and that he later learned that the phone belonged to Lavergne. Detective Lewallen left the scene to assist taking statements at the police station, and he also listened to two 911 calls. According to Detective Lewallen, the first 911 phone call was from Lavergne's phone, but it was a disconnected call or there was no information relayed in the call, and Lewallen was able to determine that the call was made from the same phone the police found outside at the scene. A recording of the first 911 call was played for the jury and Lewallen agrees that it appears the phone call connected, someone said "Hell nah[,]" and then hung up.

Detective Lewallen assisted in the interview of Lavergne at the Beaumont Police Department, along with Sergeant Hogge, Captain Earl White, Sergeant Barton, and Detective John Courts, who were present at various times. According to Detective Lewallen, he read Lavergne his *Miranda* rights, and at no time did Lavergne indicate he was not willing to give a statement, nor did he ask for a lawyer or state he wanted to end the interview. A recording of the interview was admitted into evidence and played for the jury. According to Lewallen, Lavergne seemed "[d]isconnected [and] emotionless[,]" which Lewallen felt was strange considering "[p]resumably he just found his live-in girlfriend deceased."

15

Detective Lewallen testified that during the interview Lavergne indicated that earlier he, R.J., and Gloria met up with a person named Jay White at a store, and there was an altercation about a drug transaction taking too long. Lewallen testified that Lavergne stated that Gloria and her girlfriend left the apartment between 3 and 4 a.m. on September 12, 2015. According to Lewallen, Lavergne told Lewallen that he and R.J. started fighting shortly after Gloria and her girlfriend left, and that they were fighting about R.J. wanting to do more drugs. Detective Lewallen testified that Lavergne said that the fight ended around 6 a.m. when he left and went walking around the neighborhood until 10 a.m. According to Lewallen, Lavergne told him that an individual that he referred to as "Jay White" might be the person involved in the crime. Detective Lewallen testified that Jay White's real name was determined to be Jordan Marshall and, after his whereabouts were determined during the relevant time period, he was eliminated as a suspect. Lewallen also testified that during the interview Lavergne indicated that he had located R.J.'s body inside the house and touched the body, and Lewallen thought that, based on Officer Mireles's comment at the scene about the thickness of the smoke, Lavergne's ability to find the body suggested that either he knew where R.J.'s body was inside or it was "pure happenstance." Detective Lewallen testified that Lavergne gave a different

16

description of what he was wearing at the store prior to the fire and so, at some point, Lavergne had changed clothes.

Testimony of Detective Hogge

Detective Hogge with the Beaumont Police Department testified that he responded to the scene and was ultimately assigned as the lead investigator on the case. According to Hogge, the alibi Lavergne provided during his statement was that he went on a walk at 6 a.m. for about four hours and when he came back home, he found his girlfriend, R.J., dead in a smoke-filled house.

Detective Hogge testified that Lavergne stated during the interview that while he was walking in the neighborhood that morning, he walked into the store at 4th and Pecos and purchased a beer. Detective Hogge testified he obtained surveillance video from the store for that time period and it did not depict Lavergne in or around the location. Detective Hogge also testified that Lavergne stated that during his walk he went by a food truck, and Detective Hogge talked to the owner of the food truck and could not confirm that Lavergne was there during that time frame. According to Detective Hogge, he and Sergeant Barton canvassed the neighborhood and checked with "various neighbors who might be out and about[]" and they could not find anybody that had seen Lavergne walking between 6 and 10 a.m. on September 12, 2015. Detective Hogge testified that he obtained a phone number for "Jay White"

17

from R.J.'s phone, Hogge conducted an interview of "Jay," and "Jay" was ruled out as a suspect.

Detective Hogge testified that he reviewed the 911 calls, and that in the first call, someone hung up. According to Hogge, he recognized Lavergne's voice as the caller of the second call, and Hogge did not hear any coughing, hacking, or any indication that Lavergne had any effects of smoke inhalation consistent with being in a smoke-filled house. Detective Hogge testified that the DNA report from the crime scene did not provide any other leads for him regarding the crime.

Testimony of Christian Mammarella

The Defendant called Christian Mammarella, a computer forensic examiner for Pathway Forensics, as a witness. Mammarella is an expert in cell phone forensics as stipulated to by the State, and he testified that he was hired by defense counsel who asked to make a forensic image and analyze two cell phones in this case. According to Mammarella, there was a text to Jay White from R.J.'s phone at 6:11 a.m. on September 12, 2015, saying, "Where you at?" but that a user of the phone deleted the message. Mammarella testified that that was the last outgoing text message or phone call from R.J.'s phone. Mammarella testified that he would characterize the communications from the phones between R.J. and Lavergne as "personal, friendly-in-nature" and "there was obviously a romantic relationship

18

between the two of them[.] Mammarella testified that the other phone he analyzed had a black, cracked screen and did not have a SIM card with it. According to Mammarella, the pocket in the phone for the SIM card was bent and prevented a SIM card from fitting properly in the phone and making contact with the phone, making the phone unable to make a phone call.

Testimony of Karen Vaughns

The defense also called Karen Vaughns, who testified that she was Lavergne's mother and that she had spoken to R.J. several times over the phone but never met her in person. Vaughns testified that she remembered R.J. calling her around 6 a.m. on September 12, 2015. According to Vaughns, she did not initially answer the call, but she returned the call and spoke with R.J. briefly. Vaughns testified that R.J. sounded "[l]ike normal, wide awake[,]" and she did not sound distressed in any way. Vaughns testified that R.J. said she had accidentally called her and to go back to sleep.

Lavergne's Recorded Statement

In his recorded statement admitted into evidence, Lavergne stated that he and R.J. had lived together about three months, and he moved in with her about a month after they met. According to Lavergne, he, R.J., and Gloria had gone to a convenience store on Lucas between 1 and 3 a.m. on the day of R.J.'s death to get

"some stuff" from Jay White, R.J.'s drug dealer. Lavergne stated that another male was in Jay's vehicle and R.J. and Jay had an argument in the parking lot because Jay thought the transaction was taking too long. According to Lavergne, he, R.J., Gloria, and Gloria's girlfriend went back to R.J.'s and Lavergne's apartment. Lavergne said that Gloria and her girlfriend left about 4:30 or 5 a.m. and then he and R.J. began arguing. Lavergne said he and R.J. both did cocaine. Lavergne said they argued fifteen to twenty minutes because he thought R.J. was doing too much cocaine, and R.J. called Jay White for more drugs. According to Lavergne, Jay White returned R.J.'s call and said he was down the street. Lavergne said he left between 5 and 6 a.m. after Jay called R.J. because Lavergne "was afraid of what he was going to do to him and her." According to Lavergne, he went walking to Angelina Park, bought a beer from the store at 4th and Pecos, stopped at a food truck, called "Double" from his phone to bring him some "dope," tried to call R.J. and she did not answer, and he went back home. He said he knocked on the front door and kept hearing a "beep" noise from the smoke detector, he thought she was sleeping, he called her and left a voice mail to "open the door," he knocked on his neighbor Eric's door and when he did not answer, Lavergne went to the back of R.J.'s apartment, looked through the window and saw smoke, called her name, and he ran next door again and knocked on the back door for the neighbors to call 911. Lavergne said he opened the sliding

glass door and she was "right there." He said the smoke was "real thick" and he could not see his hand in front of him. He stated his phone was still in the back yard and cracked, and when he was trying to call 911 it would not work, and he threw it down. Lavergne stated that he got Eric to call 911 and 911 asked if he could do CPR on R.J., but when Lavergne lifted her head she was "stiff as a rock" and he did not do CPR. Lavergne stated that when he heard the fire department and EMS coming down the street he ran to the front of the apartment and kicked in the front door "so they could get her." Lavergne stated that the shirt he wore when they met Jay White at the store in the early morning hours of September 12, 2015, was a different shirt than the one he was wearing the day during the interview. Lavergne stated that he believed Jay White had killed R.J.

Legal Sufficiency and Denial of Motion for Directed Verdict

In issues one through three, Lavergne challenges the legal sufficiency of the evidence to support the jury's verdict. Lavergne argues the evidence was legally insufficient to support the verdict because the evidence was insufficient to prove that (1) he was the person who caused R.J.'s death; (2) the alleged offense was committed intentionally, as required by statute; and (3) the alleged offense was committed knowingly, as required by statute. In issue four, Lavergne contends that the trial

21

court erred in denying his motion for directed verdict based on the same arguments Lavergne asserts in issues one through three.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact-finder is the exclusive judge on the credibility of witnesses and the weight to be given their testimony. *See Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give deference to the fact-finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the fact-finder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally:

'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

"Intent and knowledge are fact questions for the jury[] and are almost always proven through evidence of the circumstances surrounding the crime." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring); *see also Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). The jury may infer intent from any facts that tend to prove its existence, including the acts, words, and conduct of the defendant. *Manrique*, 994 S.W.2d at 649. Intent to kill may also be inferred from the nature and extent of the injuries inflicted on the victim, the

method of committing the crime, the size and strength of the parties, and the defendant's flight from the scene. *See id.* at 649 (noting that intent may be inferred from "the method of committing the crime and from the nature of [the] wounds inflicted on the victim[]"); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (concluding that intent may "be inferred from the extent of the injuries and the relative size and strength of the parties"); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (considering the nature of the injury inflicted and the defendant's flight from the scene, among other facts, in concluding that the evidence was sufficient to support the jury's finding of intent to kill); *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992) (considering the number and location of the stab wounds inflicted on the victim in examining the sufficiency of the evidence to support intent to kill finding). A jury may also infer knowledge from such evidence. *Manrique*, 994 S.W.2d at 649.

The jury heard Berry's testimony that they were all doing drugs that night, that when she and her girlfriend left R.J. and Lavergne were arguing, and that Lavergne had a "jealous streak" and made them feel uncomfortable that night. The jury heard the testimony of Young and Fontenot, R.J.'s neighbors, who testified that they heard R.J. and Lavergne arguing for hours, that it sounded like a struggle or furniture being moved around, and that the arguing stopped around 6 a.m. The jury

was presented evidence showing that the apartment was in disarray. The jury heard Young testify that she thought she heard R.J. say, "Sean, you're going to hurt me. You're going to kill me[,]" and the jury heard Fontenot testify that he heard R.J. say, "Get your hands off me." The jury also heard Fontenot testify that he thought Lavergne "was putting on a show[]" when paramedics and law enforcement arrived, and the jury heard testimony that R.J.'s body was just inside the open sliding glass door but Lavergne then kicked in the front door when the paramedics arrived. The jury heard testimony from paramedics and law enforcement about Lavergne's erratic behavior at the scene and testimony about the condition of R.J.'s body. The jury viewed Lavergne's recorded statement and would have been able to observe his demeanor during the interview, and the jury heard Lavergne admit that they were doing cocaine that night. The jury also heard Lavergne testify that he had gone for a walk, and to the store and when he got back he found R.J.'s body, and the jury heard law enforcement's testimony that they were unable to find anyone who saw Lavergne walking around and they found no video footage from the store that supported Lavergne's alibi. The jury heard the medical examiner's testimony of R.J.'s cause of death, injuries, and opinion that R.J.'s death was not accidental and that a combination of trauma caused her death. The jury also heard Lavergne tell the police that "Jay White" killed R.J., and it also heard the Detective testify that after

25

interviewing Jay White (Jordan Marshall) the police were able to rule him out as a suspect. The jury was free to disbelieve Lavergne's version of the events. Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably concluded, beyond a reasonable doubt, that Lavergne committed the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1); *Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *see also Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. We overrule issues one, two, and three.

"A motion for instructed verdict is essentially a trial level challenge to the sufficiency of the evidence." *Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016). Therefore, "[w]e treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence[,]" and the *Jackson v. Virginia* standard of review applies. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (citing *Jackson*, 443 U.S. at 319). Because we have concluded that the evidence presented at trial was sufficient under *Jackson v. Virginia* to support the jury's findings that Lavergne "intentionally or knowingly" caused the death of R.J., we overrule Lavergne's fourth issue.

Jury Charge

In his fifth issue, Lavergne argues the trial court committed fundamental error by charging the jury to convict him of murder by finding that he acted intentionally

26

or knowingly with regard to the conduct that ultimately led to R.J.'s death. Specifically, Lavergne argues that intentional murder is a result of the conduct and not the nature of the offense, and the jury charge erroneously provides definitions of "intentionally" and "knowingly" with respect to the nature of Lavergne's conduct in addition to the result of his conduct. Lavergne also argues that the trial court erred in charging the jury that "it must convict Lavergne" if he intentionally or knowingly caused R.J.'s death, or intentionally or knowingly engaged in conduct which resulted in R.J.'s death. Lavergne did not make an objection to the charge prior to or during the trial.

When reviewing an alleged charge error, we determine whether error existed in the charge and, if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). If no error occurred, our analysis ends. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). When an appellant does not preserve a jury charge error by making a timely objection, an unobjected-to charge requires reversal only if it resulted in egregious harm, that is, the "error is so egregious and created such harm that [the accused] has not had a fair and impartial trial[.]" *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1995) (op. on reh'g). To determine the degree of harm, a reviewing court should consider "the entire jury charge, the state of the evidence, . . .

27

the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

Here, the abstract portion of the charge provided, in pertinent part, the following definitions:

INTENTIONALLY:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

KNOWINGLY:

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The charge included a definition of murder stating:

MURDER:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

The application paragraph tracked the language in the indictment and limited the jury's finding of guilt to the allegations in the indictment:

Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about September 12, 2015, the defendant Sean Lavergne aka Sean Jeffery Lavergne, did then and there intentionally or knowingly cause the death of an individual, namely: [R.J.], hereafter styled the Complainant, by physical assault by means unknown to the Grand Jury, you shall find the defendant GUILTY of the offense of Murder.

As we concluded in *Thompson v. State*:

It is the application paragraph of a jury charge which authorizes conviction, and an abstract charge on a theory of law which is not applied to the facts is insufficient to bring that theory before the jury. *McFarland v. State*, 928 S.W.2d 482, 515 (Tex. Crim. App. 1996)[]. An abstract statement of the law that goes beyond the allegations in the indictment ordinarily will not present reversible error because ordinarily such expansions on the indictment's allegations are effectively restricted by the s application of the law to the facts, which limits the jury's deliberations to the allegations in the indictment supported by the evidence. *Sandig v. State*, 580 S.W.2d 584, 586 (Tex. Crim. App. 1979)

12 S.W.3d 915, 921-22 (Tex. App.—Beaumont 2000, pet. ref'd).

Here, the definitions tracked the Texas Penal Code provision. The application paragraph for murder limited the jury's consideration to whether Lavergne intentionally or knowingly caused the victim's death as alleged in the indictment. Considered in its entirety, the jury instructions authorized the jury to convict Lavergne of murder only if it found he intentionally or knowingly caused R.J.'s death. *See id.* Even assuming without deciding there was error in the jury charge, we note that "[w]here the application paragraph correctly instructs the jury, an error in

29

the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999). We overrule issue five.

## Conclusion

We have overruled each of Lavergne's issues on appeal. However, because the trial court failed to include in the judgment that Lavergne pleaded true to the enhancement, we modify the trial court's written judgment. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993) (noting courts of appeals have authority to modify a judgment). Specifically, in the "Plea to 1st Enhancement Paragraph" section of the judgment, we delete "N/A" and insert "True[.]" As modified, we affirm the trial court's judgment.

AFFIRMED AS MODIFIED.

_____
LEANNE JOHNSON
Justice

Submitted on January 23, 2020
Opinion Delivered April 1, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

30