Melissa Marie **FRAZIER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09–02–039 CR.

Court of Appeals of Texas,
Beaumont.

Submitted June 11, 2003.

Decided Aug. 27, 2003.

Ronnie J. Cohee, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, Philip Babin, Assistant Criminal District Attorney, Beaumont, for state.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## CORRECTED OPINION

DON BURGESS, Justice.

On this court's own motion, the opinion delivered on July 30, 2003, is withdrawn and hereby reissued. There are no substantive changes in this corrected opinion.

A jury convicted Melissa Marie Frazier of murder and sentenced her to thirty-five years' confinement in the Texas Department of Criminal Justice, Institutional Division. Frazier appeals raising three points of error. Frazier contends the evidence is legally and factually insufficient to support her conviction and the trial court erred in entering a deadly weapon finding in the judgment.

The jury found Frazier guilty "as alleged in the indictment." The indictment alleged Frazier "did then and there intentionally and knowingly cause the death of an individual, namely: TERI ANN HARDY, ... by hitting [her] with a deadly weapon, to wit: a mug, that in the manner of its use and intended use was capable of causing death and serious bodily injury, and by choking [her] with a cord." The evidence adduced at trial established that James Hornsby struck Hardy with the mug, causing her death.

The record reflects, and the State concedes, there is no evidence Hardy's death was caused by strangulation. Accordingly, the jury could not have convicted Frazier under that theory.

■ Further, the record reflects, and the State concedes, there is no evidence Frazier ever hit Hardy with the mug. Accordingly, the jury could not have convicted Frazier under that theory. The State contends, and appellate counsel concedes, that Frazier could have been convicted as a party to the offense. The indictment does not charge Frazier as a party. "But it is well-settled that the law of parties need not be pled in the indictment." *Marable v. State*, 85 S.W.3d 287 (Tex.Crim. App.2002). Additionally, the trial court's charge fails to instruct the jury that Frazier could be found guilty as a party. In the abstract portion of the charge, the trial court informed the jury of the law regarding "parties to an offense" but the application portion wholly fails to reference it.[1] Nevertheless, we review the sufficiency of the evidence to support Frazier's conviction as a party to the offense, under the *Malik*[2] standard of the hypothetically-correct jury charge.[3] See *Swartz v. State*, 61 S.W.3d 781, 785 (Tex.App.-Corpus Christi 2001, pet. ref'd). See also *Gollihar v. State*, 46 S.W.3d 243 (Tex.Crim.App.2001).

■ "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PEN. CODE ANN. § 7.01(a) (Vernon 2003). "A person is criminally responsible for an offense committed by the conduct of another if ... acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PEN.CODE ANN. § 7.02(a)(2) (Vernon 2003). As noted above, there is no evidence the murder was committed by Frazier's own conduct as she did not strike Teri Hardy. The question, therefore, is whether there is any evidence Frazier is criminally responsible for Hornsby's conduct, i.e., did she act with intent to promote or assist Hornsby? The

---

1. The charge error has not been presented on appeal. Therefore, we do not address the issue but note that under the authority of *Chatman v. State*, 846 S.W.2d 329, 332 (Tex. Crim.App.1993), and *Marvis v. State*, 36 S.W.3d 878, 880 (Tex.Crim.App.2001), the charge was clearly erroneous and the error reversible.

2. *Malik v. State*, 953 S.W.2d 234 (Tex.Crim. App.1997).

3. Thus, under current law, we review the sufficiency of the evidence to support the defendant's conviction as a party to the offense when not only was she never indicted as a party, but the jury was never instructed it could convict her as one.

only evidence Frazier aided Hornsby came from Kevin Coffey.

■ The State concedes Coffey is an accomplice witness.[4] The record reflects that at the time Coffey testified he was still under indictment for the murder of Teri Hardy. Accordingly, Coffey was an accomplice as a matter of law.[5] *See Herron v. State*, 86 S.W.3d 621, 631 (Tex.Crim. App.2002) (citing *Blake v. State*, 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998), and *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex.Crim.App.1991)). Coffey's testimony must therefore be corroborated for Frazier's conviction to stand. *See* Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon Supp. 2003), and *Fare v. State*, 1 S.W.3d 928, 930 (Tex.App.-Beaumont 1999, pet. ref'd).

■ Coffey testified, in pertinent part, as follows:

Q. Tell me what happened when you got back to the house.

A. We got back to the house, everybody went inside. I was the last one to come in. I made it to the door, and I couldn't open the door. And then—

Q. What happened next?

A. Well, I was wondering why the door wouldn't open. So, I looked around the door and Melissa pointed up to a picture and said, "Look what my mom got me. That's pretty."

. . . .

Q. You said you heard Melissa point up at a picture?

A. Yeah.

Q. Who was she talking to?

A. I assume Teri, because she was over in that direction.

Q. What room were they in?

A. It would be, like, the bedroom/living room area. It's all one room.

. . . .

Q. Okay. When you were looking into the bedroom, could you see Melissa?

A. Yes.

Q. Could you see James?

A. Yes.

Q. Could you see Teri?

A. No.

Q. What did Melissa say to Teri?

A. She said, "Look. Look at the picture my mom got me," said it was a pretty picture.

Q. What did you observe next?

A. I look—I looked back towards, like James; and then I tried pushing on the door again. It wouldn't open. And that's when I noticed Melissa handed James the mug, and that's when he went at her.

Coffey's testimony is evidence that Frazier assisted Hornsby by distracting Teri Hardy and then handing Hornsby the mug which he used to cause her death. There is no evidence from any other source establishing these same facts. However, it is not necessary that the non-accomplice evidence directly link the defendant to the commission of the offense. *See Fare*, 1 S.W.3d at 931. "The rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Id.* (citing *Hernandez v.*

4. In exchange for dropping the charge from murder to tampering with evidence, Coffey agreed to testify for the State and plead guilty to the lesser offense, which carries a punishment range of two to ten years in prison.

5. The trial court's charge to the jury which permitted the jury to determine whether Coffey was an accomplice as a question of fact is therefore clearly erroneous. *See Herron*, 86 S.W.3d at 631. We do not address the issue as the error has not been presented on appeal.

*State,* 939 S.W.2d 173, 176 (Tex.Crim.App. 1997)). Frazier's own statements provide that evidence.

Frazier gave two statements to police on July 17, 2001. Two days later, Frazier gave a third statement.[6] She recounted the following, in pertinent part:

This is a continuation of an earlier statement that I gave to Detective Robertson and Harrison the other day. I would like to clear up some additional facts that I did not mention to the officers at the time.

After Terri [7] Hardy was beat by James Hornsby and she fail [sic] to the floor, I bent down next to her. There was a[sic] electrical clock on the TV that was plugged into the wall next to where Terri's head was laying. I could hear Terri making some gurgling type noises. I was thinking only of how I could help James at that moment. I knew that Terri was going to die and wanted to put her out of her pain. I had the thought of putting the electrical cord around her neck at that moment. I pulled the electrical cord plug form [sic] the electrical outlet that was in the wall. The clock fail [sic] from the TV at that time. Terri's [sic] was laying face down, with her head facing her left side. Her head was up against and sort of angled up against the wall. I grabbed the cord and wrapped the cord over her head. I did not have to touch her for I pulled on the electrical cord and it slipped in between her head and the wall. I did not pull on the cord at that time. I knew that James would take over and finished [sic] it. I only gave him to [sic] idea. He grabbed the electrical cord and began to strangle Terri. This lasted only for about three seconds. I believe now that she was already dead.

We find Frazier's admission that she placed the cord around Teri Hardy's neck to give Hornsby the idea to strangle her to be sufficient corroboration to support Coffey's testimony that Frazier aided Hornsby.

■ We now turn to the rest of the evidence to determine its sufficiency to support Frazier's conviction. In Frazier's first statement to police, she claimed a guy named John picked Hardy up from her house. In the second, Frazier stated, in pertinent part:

When we got back to the house James was still fighting with Terri. Terri was getting beat up pretty bad. Terri was trying to fight back but she was not doing very well. James got her down in my house near the TV stand and the corner where the TV sets. He was beating her in the head with his fists. I was telling James to stop but he would not stop. He grabbed a glass beer mug and started hitting her in the back of the head with the beer mug. He hit her about seven times. I could see blood coming out of her head. I could see that her head looked like mush. I walked out because I knew that Terri was going to die. I could hear her making noises. The noises were gurgling noises. I walked into the kitchen to get away from them. While James was beating Terri, Kevin had gone outside. James quit hitting Terri. Her head was half gone in the back.

Coffey gave two statements to the police, both of which were admitted into evidence. In the statement given July 17, 2001, Coffey recounted the events of July 12 as follows, in pertinent part:

---

6. Frazier did not testify at trial.

7. In Frazier's statements, as well as Coffey's, Hardy's name is spelled "Terri."

When we arrived at the house on Park St. we all went inside. The guy and the girl started talking to each other. The girl was upset. The girl was talking about snitching. I don't know what she was talking about. I thought it was about the guy hitting her. I saw this guy grab a glass beer mug and move towards the girl. I walked out of the house. I went outside and took a leak in the yard. I then heard a woman scream. I also heard a clump. It sounded like something hit something. I waited about five minutes then went back inside the house. I saw the girl that had been fighting with the guy laying near the TV in a pool of blood. She was face down. The guy walked into the kitchen then he walked outside. Melissa was standing in the bedroom looking at the girl on the floor. I turned and went back outside.

In his second statement, given July 18, 2001, Coffey described the events as follows, in pertinent part:

Last night I gave a statement to the Detectives and most of the statement is true. I did some thinking last night and would now like to clear up some things that I said and something's [sic] that I did not say to the Detective.

. . . .

I would also like to say that I never saw anyone actually hit Terri. When I first arrived at the apartment earlier in the evening, I was told that Terri and James had gotten into a fight. I do not know what the fight was about. Later in the evening while we were all in Melissa's apartment, I heard Terri and James to begin [sic] an argument. I was standing near the front door. I felt that something bad was going to happen due to the way Terri and James were involved in the argument. I then saw James to move [sic] toward Terri in an angry manner and he had a beer mug in

his right hand. He was about to swing it toward Terri and I turned and quickly walked out of the door into the yard. When I got outside I heard a sound of someone being hit, a woman's scream, and then several other striking sounds. I then did not hear anyone talking or any noises. I waited outside for about four or five minutes. I walked back into the very small apartment and saw that Terri was laying on the floor in the bedroom. Terri was laying face down with her head near the TV set near the wall. I think her face was turned to the left side. Terri was not moving and was bleeding a lot from her head area. Laying next to Terri was an extension cord that was about three feet long. The electrical extension cord had a male type plug on one end and the other end looked like it had pulled apart from a lamp, fan or an electrical appliance of some type. . . .

I recall that as we were traveling to Louisiana (James, Melissa, and I), we were talking about what had happen [sic]. Melissa told me, "I strangle [sic] Terri with the cord". I was surprised when she said that for I did not know. Melissa said this in a bragging type of voice. James said, "this felt kind of good, I have never done this before". James and Melissa both were acting like they were proud of what they did.

At trial, Coffey offered the following account:

Q. Could you see James hitting Teri?

A. No. That was behind the corner of a wall.

. . . .

Q. Did you actually see James hit Melissa with the mug?

A. No.

Q. How do you know he hit her with the mug?

A. He went at her and then I heard a—I heard something—I heard a hit.

Q. What did it sound like?

A. A conking sound. Conk.

Q. How many hits did you hear?

A. At least six.

Q. What did you do?

A. I ran outside and hit the ground and I covered my head.

. . . .

Q. What did you do next?

A. I stayed there. I didn't hear nothing. I heard Melissa say "Kevin." And I said, "Yeah."

I was still outside on the ground. I got up and I walked to the door. That's when I looked in and I seen that she had grabbed a cord and tried to strangle her.

. . . .

Q. Okay. And at that point what did you observe Melissa Frazier doing?

A. That's when I seen her. She had the cord around her neck.

. . . .

Q. What was Ms. Frazier doing?

A. She had it held around her throat.

. . . .

Q. How was Melissa acting during this time?

A. They both were acting kind of boastful about it.

Q. Boastful?

A. Yeah.

Q. Did Melissa, in particular, say anything?

A. "I strangled—I strangled her."

Q. When you mean "boastful," what do you mean?

A. Just kind of excited, like proud almost.

There are both consistencies and contradictions between Coffey's statements and his trial testimony. As the trier of fact, the jury is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony and it is for the jury to resolve any conflicts and inconsistencies in the evidence. *See Thompson v. State*, 12 S.W.3d 915, 924 (Tex.App.-Beaumont 2000, pet. ref'd)(citing Tex.Code Crim. Proc. Ann. art 38.04 (Vernon 1979); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App.1981); and *Bowden v. State*, 628 S.W.2d 782, 784–85 (Tex.Crim. App.1982)). Viewing all of the evidence in the light most favorable to the verdict, we find any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Ovalle v. State*, 13 S.W.3d 774, 777 (Tex.Crim.App.2000). Furthermore, a neutral review of all the evidence, both for and against the jury's finding, does not demonstrate that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, nor does it demonstrate that the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *See Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Accordingly, we find the evidence is both legally and factually sufficient to support Frazier's conviction as a party to the offense. Issues one and two are overruled.

■ Issue three claims the trial court erred in entering a deadly weapon finding in the judgment. We agree. Generally, an affirmative finding of a deadly weapon may be entered when the (a) indictment alleges the use of a deadly weapon and the jury finds the defendant guilty as charged in the indictment, (b) the weapon is deadly per se, (c) or the jury affirmatively answers a special issue on the matter. *See Lafleur v. State*, 106 S.W.3d 91, 93 (Tex. Crim.App.2003). The trial court did not submit the deadly weapon question to the jury as a special issue. The weapon is not

a deadly weapon per se. Although the indictment expressly alleged Frazier used or exhibited a deadly weapon, and the jury found her guilty "as charged in the indictment," the verdict did not constitute an affirmative finding that Frazier personally used or exhibited a deadly weapon because her conviction can only be sustained under law of the parties. *See Taylor v. State*, 7 S.W.3d 732, 740 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Furthermore, the jury's verdict did not constitute an affirmative finding Frazier was a party to the use of a deadly weapon because the court's charge failed to require a finding that Frazier knew a deadly weapon would be used or exhibited during the offense. *See Howard v. State*, 966 S.W.2d 821, 829 (Tex. App.-Austin 1998, pet. ref'd).

■ There is a divergence of authority as to the remedy, if any, when the defendant is subject to the same limitations on parole eligibility regardless of the deadly weapon finding. *Compare Jones v. State*, 986 S.W.2d 358, 363–64 (Tex.App.-Beaumont 1999, pet. ref'd); *Taylor*, 7 S.W.3d at 741; and *Patterson v. State*, 950 S.W.2d 196 (Tex.App.-Dallas 1997, pet. ref'd), *with Gilbert v. State*, 2002 WL 1877173 (Tex. App.-Beaumont 2002, no pet.) (not designated for publication); and *Barnes v. State*, 56 S.W.3d 221, 240 (Tex.App.-Fort Worth 2001, pet. ref'd). We do not disagree with the necessity of conducting a proper harm analysis when it must be determined if there is sufficient cause for reversal of an appellant's conviction. *See Gonzales v. State*, 994 S.W.2d 170, 171–72 (Tex.Crim.App.1999); and Tex.R.App. P. 44.2. However where, as in the case at bar, the relief sought is not reversal but reformation of the trial court's judgment to delete that which the trial court had no authority to find, we determine it is the better practice to correct the error so that the judgment accurately reflects the jury's findings. Accordingly, issue three is sustained.

We reform the judgment so as to delete the affirmative finding of the use of a deadly weapon and affirm the judgment as reformed.

AFFIRMED AS REFORMED.