In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00082-CR
_____

TIMOTHY LEWIS, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 19-33025
_____

## MEMORANDUM OPINION

A grand jury indicted Appellant Timothy Lewis for aggravated robbery by using and exhibiting a deadly weapon, namely a firearm. *See* Tex. Penal Code Ann. § 29.03(a)(2). Lewis pleaded "not guilty" to the crime charged, but a jury found Lewis guilty as charged. Lewis pleaded "true" to four enhancements, and the jury assessed punishment at fifty years' confinement. Lewis appeals his conviction, raising nine issues. We affirm.

1

Testimony of Anton[1]

Anton testified that on July 22, 2019, he lived in a townhouse with his girlfriend Donna and her two children, but her children were not present that night. According to Anton, the number of the unit he lived in was 1205. Anton recalled that during the day of July 22, he talked with Jordan Spiller two or three times about some marijuana and edible candies that Anton was selling, and that Jordan was "on the phone and texting…as he was taking pictures of the marijuana and the edible candies." According to Anton, Jordan also knew Donna. Anton also recalled that he had seen a little gray Mazda circling around near his home three or four times that day.

Anton testified that he got home at about 9:00 or 10:00 that night, and he noticed the Mazda outside his home. According to Anton, when he got out of his truck, he grabbed a Crown Royal bag that contained about $500 or $1000 from sales he had made that day. Anton testified that as he approached the front door, he heard noise, some people ran towards him and told him to "give it up[,]" he dropped the bag, and the people dug in his pocket and took off his jewelry. Anton also testified that there were four people, they wore black ski masks, they all held guns to him,

---

[1] We use pseudonyms to refer to the alleged victims. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

they opened the door, and then they held him on the living room floor. According to Anton, the people were digging through his things and looking for his girlfriend. Anton testified that two people went upstairs and two stayed downstairs, one person wanted to shoot him, and they wanted to take his truck. Anton recalled that at some point, one of the people opened the front door and quickly shut it, which led Anton to believe that the police were outside. Anton testified that three of the people ran out the back door, but the fourth person was still upstairs. According to Anton, the fourth person came downstairs asking where his partners were, Anton told him they left, and when the man opened the front door, the police entered, the man dropped the guns, and the police took the man's mask off.

Anton testified that after the police arrived, he saw that his money was gone, but everything else was "intact[]" except that things had been strewn about, and Donna's computer was left on the lawn. Anton further testified that his girlfriend had been hiding in the bathtub "on the phone with the dispatcher[]" the whole time. Anton was not able to identify any of the four people because they wore masks. Anton testified that he did not know Timothy Lewis, but he recognized his face because he had seen him riding around in the Mazda that day. Photographs of the inside and outside of Anton's home that night were admitted into evidence.

3

<u>Testimony of Donna</u>

Donna testified that in July 2019, she and her two children lived with Anton. She also testified that she knew Jordan through her family, and she had seen him around, but he had not been to her home and there was no reason he would know where she was living. Donna testified that she left her children with their grandmother on July 22, she got home around 7:30 or 8:00, and Anton got home around "9 something." According to Donna, she heard Anton's truck when he drove up, she heard the truck door close, and before Anton got to the front door, she heard Anton say "Hey, man, take everything. You got it. Go ahead. You can take everything[.]" Donna testified that she ran to the bathroom, hid in the tub, and called 911 for help. Donna recalled that she could hear people enter and run through the house, one of the people made Anton get on the ground. At one point, Donna heard the front door open, and she heard the police say "get on the ground." Donna also heard what sounded like two people run out the back door. Donna testified that once the police had arrived, she left the bathroom and told them that Anton was her boyfriend and he was "supposed to be here[.]" Donna also testified that the home had been ransacked, and it appeared the people had taken her laptop and left it in the bushes. Donna agreed that the people had not been invited to her home, and there was no reason for them to be at her home that night except for the robbery. Donna testified that she did not see any of the people except for the one person the police

4

caught at the front door, but she remembered hearing "about four[]" voices that night.

Testimony of Sergeant Shannon Meaux

Sergeant Shannon Meaux, a patrol sergeant with the Port Arthur Police Department, testified that on the evening of July 22, 2019, he was dispatched to a burglary in progress that "ended up ultimately being an aggravated robbery, home invasion robbery." Meaux recalled that as he approached the townhouse, he noticed a screen off a window at one of the townhomes and someone wearing dark clothing exit unit 1205, and the person started running away when he saw Meaux. Meaux testified that he chased after the man, but he did not catch him, and after other officers caught the man, he was detained and placed in hand restraints. According to Meaux, he went back to the townhome to check on the residents, and before he could knock on the door, the door opened, and a man said "Awe, sh*t." Meaux testified that he told the man to lie on the ground and comply, and Meaux saw two pistols on the ground. Meaux agreed that one of the weapons turned out to have been stolen. According to Meaux, the suspect on the ground was talking with Anton, and Meaux thought the suspect "had known where the victim was and what he was doing during the day prior to this." Meaux agreed the home was in "disarray[.]"

5

Meaux agreed he was wearing a body camera that night, and he agreed that the video in State's Exhibit 42 was a fair and accurate depiction of what happened that night. The video from Meaux's body cam was published to the jury.

Testimony of Officer Terry Tran

Officer Terry Tran, a patrol officer with the Port Arthur Police Department, testified that on the night of July 22, 2019, he heard a call on the radio reporting a home invasion burglary, and he went to the location to assist other officers. Tran testified that another officer had told him a suspect was fleeing at high speed in a gray Mazda. Tran intercepted that vehicle, stopped it, and told the suspect to keep his hands up. Tran testified that when he looked inside the Mazda, he saw a silver revolver on the floorboard. According to Tran, the suspect in the Mazda's last name was Spiller.

Testimony of Detective George Clark

Detective George Clark testified that on July 22, 2019, he was a patrol officer on the evening shift with the Port Arthur Police Department, and he responded to a call at a townhome. Clark recalled that as he approached the home in question, he was told that someone was running west through the area, and he saw the man run straight toward him. Clark testified that he and another officer told the man to stop, the man turned and ran the other way, and Clark pursued him. According to Clark, he did not catch the man, but he caught up with a car that was speeding out of the

complex, and he chased after the car and notified dispatch. Clark testified that Officer Tran stopped the vehicle and Clark assisted Tran in taking the suspect into custody. Clark recalled seeing a handgun on the floor of the car. According to Clark, the driver of the car was identified as Jordan Spiller. Clark agreed he was wearing a body camera that night, and the video from the body camera was admitted into evidence and published to the jury.

Testimony of Malaurie Cruz

Malaurie Cruz, a forensic specialist with the Port Arthur Police Department, testified that she was called to a scene of an aggravated robbery on July 22, 2019, to take photographs and collect evidence. Cruz testified that State's Exhibits 17, 19, 43, and 44 were photographs of ski masks found at the scene, and she identified Exhibits 18 and 23 as black ski masks found at the scene. Cruz also testified that she found gloves at the scene that the residents said did not belong to them. Cruz agreed that she also collected ammunition and firearms from the scene. On cross-examination, Cruz agreed that she dusted for fingerprints at the home, and she did not find any of Lewis's prints inside the home.

Testimony of Officer Isaiah Seltzer

Officer Isaiah Seltzer, a patrol officer with the Port Arthur Police Department, testified that on July 22, 2019, he was called out to a home invasion. As he entered the townhome complex, he encountered another officer chasing a man running west,

7

and Seltzer also started running after the man. Seltzer testified that when he caught up with the man, the man did not put up a struggle, and Seltzer took him into custody. According to Seltzer, the man was saying "Yeah, it's 1205. It's 1205[,]" and he said people were still in the residence and someone was hiding in a vehicle. Seltzer testified that the man identified himself as Timothy Lewis, and Seltzer identified the defendant as Lewis. Seltzer agreed he was wearing a body camera that night, he identified Exhibit 46 as his body cam video, and the video was published to the jury. On cross-examination, Seltzer agreed he did not see Lewis in Townhouse unit 1205.

After the State rested, the defense did not offer any witnesses or evidence.

Issues

Appellant's first three issues challenge the sufficiency of the evidence to support his conviction. In his first issue, Appellant argues that the evidence is not sufficient because he did not actively participate in any activity at Anton's home and he remained outside. In his second and third issues, Appellant argues that the evidence is legally and factually insufficient that he used or knew that firearms would be used at Anton's home.[2] Appellant's next four issues (four through seven) argue that the trial court erred by not including a specific instruction in the jury

---

[2] Issue two challenges the legal sufficiency that Lewis used or knew that firearms would be used at Anton's home, and issue three challenges the factual sufficiency thereof. When an appellant challenges the sufficiency of the evidence in a criminal case, we review the evidence under the standard for legal sufficiency only. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

charge on whether a deadly weapon was used. Appellant's last two issues argue that the trial court committed reversible error in the jury charge during the punishment phase because it misstated the law. Specifically, Appellant argues that the jury charge included an instruction on "good conduct time" in violation of article 37.07, section 4(a) of the Texas Code of Criminal Procedure.

## Sufficiency of the Evidence

In three issues, Appellant argues that the evidence was not sufficient to sustain his conviction. According to Appellant, there was no evidence that he was ever inside Anton's home, no evidence that he "actively participated" in the robbery, and no evidence that he used a firearm or deadly weapon. Appellant also argues that the evidence is insufficient because, although he rode to Anton's townhome with Spiller and another man, Lewis stayed inside the car while Spiller and the other man got out of the car and entered Anton's townhome. Appellant acknowledges this last argument relies on evidence outside the record. We may not consider matters outside the appellate record. *See Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court may not consider factual assertions that are outside the record[.]").

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt.

9

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). While a jury is permitted to draw reasonable inferences from the evidence, it is not permitted to draw conclusions based on speculation or factually unsupported inferences or presumptions. *See Hooper*, 214 S.W.3d at 15. The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate court does not reweigh the evidence or determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

We "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most

favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits robbery if, in the course of committing theft, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *See* Tex. Penal Code Ann. § 29.02(a). A person commits aggravated robbery if he commits robbery and causes serious bodily injury, uses or exhibits a deadly weapon, or causes serious bodily injury or threatens or places the victim in fear of imminent bodily injury or death if the victim is sixty-five years of age or older or disabled. *Id.* § 29.03(a).

The jury charge in this case included an instruction on the law of parties. Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which

11

he is criminally responsible, or by both." *Id*. § 7.01(a). Culpability under the law of parties does not distinguish between principals or accomplices. *See id.* § 7.01(c). "'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'" *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 739-40.

In this case, Anton testified that four people approached him with guns pointed at him in front of his home on the night of July 22, 2019. Anton testified that they used his key to open the front door, and they laid him on the ground while they went throughout the house. According to Anton, all four persons pointed their guns at him, and at least one of them wanted to shoot him. Donna testified that she hid in the bathtub while the intruders were in the house, and she called 911 to report the incident. Anton testified that one of the people opened the front door and shut it quickly, after which the police entered the house and the other intruders left through the back door. Donna also testified that two people left the house out the back door. Anton reported that several hundred dollars were stolen. Police chased several men they found running from Anton's home. One of the men police encountered told the

police he was Timothy Lewis. A handgun was found in a gray Mazda at the scene. Anton testified that he had seen a gray Mazda earlier that day circling in the area, and he recognized the defendant as the person he had seen in the Mazda. The police found three ski masks and firearms at the scene. Videos from the body cameras of Officers Meaux, Clark, and Seltzer were published to the jury.

On this record, we conclude the evidence of Appellant's guilt was legally sufficient. The jury could have made reasonable inferences from the evidence and concluded that the evidence showed beyond a reasonable doubt that Lewis used a firearm and, while committing theft, put Anton or Donna in fear of imminent injury or death. The jury could have also inferred guilt from evidence that Appellant fled from the residence and from police that night, along with Anton's testimony that he had seen a gray Mazda earlier that day circling in the area, and that he recognized the defendant as the person he had seen in the Mazda. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011); *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995) (citing *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989)); *Hill v. State*, 161 S.W.3d 771, 776 (Tex. App.—Beaumont 2005, no pet.). After reviewing all the evidence and viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found the essential elements beyond a reasonable doubt necessary to conclude that Appellant was criminally responsible either as a principal or under the law of parties for the offense

of aggravated robbery as charged in the indictment. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Salinas*, 163 S.W.3d at 739-40. We reject Appellant's sufficiency challenge, and we overrule his first three issues.

Deadly-Weapon Finding

In four issues (four through seven), Appellant argues that the trial court committed reversible error by not requesting a separate jury finding on the deadly-weapon issue, and that such alleged error violated his due process rights to a fair trial under the Sixth and Fourteenth Amendment of the U.S. Constitution, violated the presumption of innocence under the Eighth and Fourteenth Amendments, and violated section 2.05 of the Texas Penal Code. According to Appellant, the trial court's entry of a deadly-weapon finding where the jury charge did not include a special instruction requiring a jury determination on whether a deadly weapon was used means that the trial court improperly relied on "an implied or imputed jury finding[.]" Appellant also argues in the absence of a separate question on deadly weapon, the issue is "handled as a presumption[.]" Under section 2.05 of the Penal Code, where the evidence raises a presumption, the trial court must instruct the jury on the presumption and the facts giving rise to the presumption must be proven beyond a reasonable doubt and that, even if such facts are proved beyond a reasonable doubt, the jury is not bound to find the element of the offense sought to be presumed. *See* Tex. Penal Code Ann. § 2.05.

14

The defense did not object at trial that the jury charge did not request a separate finding on whether a deadly weapon was used. Therefore, Appellant failed to preserve this alleged error for review. *See* Tex. R. App. P. 33.1. According to Appellant, the failure to give instructions pursuant to section 2.05 constitutes fundamental error, even where no objection at trial preserved error. We find this argument unmeritorious because we find no error.

According to Appellant, the trial court's entry of a deadly-weapon finding "which was not expressly directed to, or decided by, the jury[]" created "a mandatory presumption by operation of law[,]" citing to *Yates v. Evatt*, 500 U.S. 391 (1991). Presumptions and inferences are evidentiary devices that permit the factfinder to determine the existence of an element of the crime from one or more evidentiary or basic facts. *Willis v. State*, 790 S.W.2d 307, 309 (Tex. Crim. App. 1990) (citing *Ulster Cty. Court v. Allen*, 442 U.S. 140, 156 (1979)). Presumptions may be mandatory or permissive. *Id.* A jury charge creates a mandatory presumption if it requires a jury to find an elemental fact based on proof of a predicate fact or if it requires the defendant to disprove the elemental fact once the predicate fact has been established. *See id.* A permissive presumption allows, but does not require, a jury to infer the element from the predicate facts, and permissive presumptions are generally constitutional. *See Webber v. State*, 29 S.W.3d 226, 231 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *Willis*, 790 S.W.3d at 310). Mandatory presumptions

15

are unconstitutional because they "relieve the State of the burden of proving every element of the offense beyond a reasonable doubt." *Garrett v. State*, 220 S.W.3d 926, 930 (Tex. Crim. App. 2007).

In *Yates*, the trial court instructed the jury on two mandatory presumptions: that malice is implied or presumed (1) from the willful, deliberate, and intentional doing of an unlawful act and (2) from the use of a deadly weapon. 500 U.S. at 401. The instructions further provided that the presumptions were not conclusive but were rebuttable by the rest of the evidence. *Id.* The Supreme Court explained that although the instructions provided that the presumptions were rebuttable, "the mandate to apply them remained, as did their tendency to shift the burden of proof on malice from the prosecution to petitioner." *Id.* at 401-02. The Court concluded that, considering all the evidence, the record did not provide clear evidence of the defendant's intent to kill and that "[t]he burden-shifting jury instructions [that were] erroneous in this case may not be excused as harmless error." *Id.* at 411.

In this case, the jury charge includes no "burden-shifting jury instructions[.]" *See id.* Appellant fails to identify in his Appellate Brief any instruction that required the jury "to find an elemental fact upon proof of a particular predicate fact or facts[]" that "require[d] the accused to disprove the elemental fact once the predicate fact ha[d] been established[,]" or that "eliminate[d] the State's constitutionally required burden of proving guilt beyond a reasonable doubt." *See Willis*, 790 S.W.2d at 309.

16

Therefore, Appellant failed to establish that the trial court's entry of a deadly-weapon finding "created a mandatory presumption by operation of law."

Appellant further argues that the failure to give an instruction pursuant to section 2.05 of the Penal Code constitutes fundamental error, citing to *Wilson v. State*, 658 S.W.2d 615, 617 (Tex. Crim. App. 1983) and *Goswick v. State*, 656 S.W.2d 68 (Tex. Crim. App. 1983). Both *Wilson* and *Goswick* concerned an instruction that "it shall be presumed that the person was intoxicated[]" where a chemical analysis reflected a blood alcohol level greater than 0.10. *Wilson*, 658 S.W.2d at 616; *Goswick*, 656 S.W.2d at 69. Because in *Wilson* and *Goswick* intoxication was an element of the crime charged—driving while intoxicated—the presumption pertained to an essential element on which the State had the burden of proof, and the Court of Criminal Appeals concluded that the failure to give an instruction under section 2.05 was fundamental error and required reversal, even though the defendant had not objected to the jury charge. *Wilson*, 658 S.W.2d at 617-18; *Goswick*, 656 S.W.2d at 69-70.

Section 2.05 of the Penal Code requires a special instruction "when this code or another penal law establishes a presumption with respect to any fact[.]" *See* Tex. Penal Code Ann. § 2.05. In this case, however, the jury charge included no instruction on any presumption (other than the presumption of innocence). The Court of Criminal Appeals has explained that there are three ways in which a trial court

17

may make an affirmative finding of a deadly weapon when the jury is the trier of fact: (1) when the indictment itself alleges a deadly weapon; (2) when the instrument used is per se a deadly weapon, such as a firearm; or (3) when the jury makes an affirmative finding through a deadly weapon special issue included in the jury charge. *Lafleur v. State*, 106 S.W.3d 91, 95 (Tex. Crim. App. 2003); *see also Crumpton v. State*, 301 S.W.3d 663, 665 (Tex. Crim. App. 2009); *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985). A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. Tex. Penal Code Ann. § 1.07(a)(17)(B). The Penal Code also specifically defines a firearm as a deadly weapon. *See id.* § 1.07(a)(17)(A); *see also Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005) ("A firearm is a deadly weapon per se.").

The indictment in this case alleged that Lewis "while in the course of committing theft of property owned by [Anton]…and with intent to obtain and maintain control of said property, intentionally and knowingly place[d] [Anton] in fear of imminent bodily injury and death, by using and exhibiting a deadly weapon, to wit: a firearm[.]" The jury charge included a definition of "deadly weapon" that tracked the language of section 1.07(a)(17) of the Penal Code, including defining a firearm as a deadly weapon. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A). The jury charge also stated, in relevant part (with emphasis added):

> Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about July 22, 2019, the defendant

18

> Timothy Keith Lewis, individually or as a party with one or more others as the instruction of "Parties to an Offense" is defined within these Instructions, did then and there while in the course of committing theft of property owned by [Anton], hereafter styled the Complainant, and with intent to obtain or maintain control of said property, intentionally or knowingly place [Anton] in fear of imminent bodily injury or death, by *using or exhibiting a deadly weapon, to-wit: a firearm*, you shall find the defendant GUILTY of the offense of Aggravated Robbery.

We cannot agree with Appellant that the application portion of the jury charge did not include an instruction on deadly weapon. The instruction specifically required that, in order to find the defendant guilty, the jury must find that he used or exhibited a deadly weapon (among other elements of the crime). The jury found Lewis guilty "as charged in the indictment." Therefore, we conclude that the trial court's entry of an affirmative finding that Lewis used a deadly weapon, namely a firearm, was proper. *See Lafleur*, 106 S.W.3d at 95.

Appellant also argues that when a conviction can only be sustained under the law of parties, the jury's verdict does not constitute an affirmative finding on deadly weapon in the absence of a specific instruction to the jury on deadly weapon.[3] For this argument, Appellant cites *Frazier v. State*, 115 S.W.3d 743 (Tex. App.—Beaumont 2003, no pet.). In *Frazier*, we stated that "the verdict did not constitute an affirmative finding that Frazier personally used or exhibited a deadly weapon

---

[3] Appellant raised this argument as a challenge to the sufficiency of the evidence. We address it here because the argument challenges the lack of an instruction requiring a specific finding on deadly weapon.

19

because her conviction can only be sustained under law of the parties." *Id.* at 750. The weapon allegedly used in *Frazier* was a glass beer mug, and the record included no evidence that Frazier hit the victim with the mug. *Id.* at 745, 747. The glass beer mug was not a deadly weapon per se. *Id.* at 749-50. However, in the instant case, the indictment alleged the use of "a deadly weapon, to wit: a firearm[,]" and the jury charge defined a firearm as a deadly weapon, consistent with the Penal Code. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A).

We find *Frazier* distinguishable because in this case, the indictment did not charge Lewis solely under the law of parties, and the evidence does not reflect that Lewis's conviction could only be sustained under the law of parties. Although the jury charge included an instruction on the law of parties, there is no indication that the jury found Lewis guilty only as a party and not as a principal. Anton testified that four people with guns confronted him outside his home and all four were inside his home on the night of the robbery. There is no evidence in the record to support Appellant's assertion on appeal that he stayed in the car while others broke into Anton's home.

The record before us reflects that, as in *Lafleur*, the trial court could have made a deadly-weapon finding (1) because the indictment alleged the use of a deadly weapon and (2) the instrument used—a firearm—was per se a deadly weapon. *See*

*Lafleur*, 106 S.W.3d at 95. We find no error, and we overrule issues four through seven.

Punishment Phase Jury Charge Error

In two issues, Appellant argues that the trial court erroneously included an instruction that included references to "good conduct time" or "good time" contrary to the requirements of section 4(a) of article 37.07 of the Texas Code of Criminal Procedure.

In 2019, the Texas Legislature amended Article 37.07, Section 4, subsections (a) through (c), of the Texas Code of Criminal Procedure. Act of May 15, 2019, 86th Leg., R.S., ch. 260, § 3, 2019 Tex. Sess. Law Serv. 446, 446-48 (codified at Tex. Code Crim. Proc. art. 37.07, § 4(a)-(c) (Supp)). Those amendments apply to any defendant sentenced on or after September 1, 2019. *See* Act of May 15, 2019, 86th Leg., R.S., ch. 260, § 3, 2019 Tex. Sess. Law Serv. 446, 448. *See Holiness v. State*, No. 06-21-00038-CR, 2021 Tex. App. LEXIS 8050, at *15 (Tex. App.—Texarkana, Oct. 1, 2021, pet. ref'd) (mem. op., not designated for publication) (discussing the legislative history of the recent amendments). Lewis argues that the trial court erred by using an outdated version of the good conduct time and parole instructions found in Section 4(a) of Article 37.07.

The current version of Section 4(a) of Article 37.07 applies to the penalty phase of the trial of a felony case if the judgment contains an affirmative finding

21

under Article 42A.054(c) or (d). *See* Tex. Code Crim. Proc. Ann. art. 37.07, § (4)(b), 42A.054(c), (d) (providing that a court may not award community supervision where the judgment includes a deadly-weapon finding). Section 4(a) states that the trial court shall instruct the jury as follows:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.
>
> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant."

*Id.* art. 37.07, § 4(a). There is no reference to good conduct time in the current version of Section 4(a). *See id.* The Texas Court of Criminal Appeals has discouraged any deviations from the verbatim language dictated in Section 4(a). *See Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002). The trial court included references to good conduct time in the following portion of the jury charge:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration

22

imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignment, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, (s)he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time (s)he may earn. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if (s)he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Lewis did not object to the charge. The State acknowledges that the jury charge "did not precisely track the language of Article 37.07[]" but the State argues that Appellant did not suffer egregious harm. Appellant argues that the deviation from the required statutory language constitutes reversible error.

When, as here, a defendant fails to object to the court's charge or states he has no objection to it, we will not reverse for jury charge error unless the record shows

23

"egregious harm" to the defendant. *See Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Pursuant to *Almanza*'s egregious harm standard, the record must show a defendant suffered actual, rather than merely theoretical, harm from the charge error. *Almanza*, 686 S.W.2d at 174. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Ngo*, 175 S.W.3d at 750 (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

In analyzing whether egregious harm resulted, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *Shavers v. State*, 985 S.W.2d 284, 291 (Tex. App.— Beaumont 1999, pet. ref'd). Factors courts consider when assessing egregious harm in the context of an erroneous parole instruction include: (1) the presumption the jury followed any mitigating instruction; (2) whether a jury note existed regarding parole or good-conduct time; (3) the State's emphasis of the possibility of parole in argument; and (4) the severity of the defendant's sentence. *See Hooper v. State*, 255 S.W.3d 262, 271-72 (Tex. App.—Waco 2008, pet. ref'd); *see also Igo v. State*, 210

24

S.W.3d 645, 647-48 (Tex. Crim. App. 2006) (discussing various factors mitigating against finding of egregious harm when appellant received maximum sentence).

Several factors mitigate against a finding of egregious harm in this case. *See Igo*, 210 S.W.3d at 647. The jury assessed punishment at fifty years' imprisonment—about half the maximum sentence. *See* Tex. Penal Code Ann. § 12.32(a) (first-degree felony is punishable by a term of not more than 99 years or less than 5 years). Punishment in the middle of the allowable range does not support a conclusion that the jury attempted to apply the parole law to Lewis, or to predict how it might be applied to him. *See Stewart v. State*, 293 S.W.3d 853, 860 (Tex. App.—Texarkana 2009, pet. ref'd). The charge contained a curative instruction admonishing the jury that it could not consider the extent to which good conduct time could be awarded or forfeited by this particular defendant. *See id.* Absent indications to the contrary, we presume the jury followed the trial court's curative instruction. *See Shavers*, 985 S.W.2d at 292. Here, there are no indications the jury did not follow this instruction. Further, the record does not indicate the jury sent any notes or had any communications regarding the applicability of good conduct time or parole. *See id.* The State did not mention good conduct or the possibility of parole in its argument. *See id.*; *see also Igo*, 210 S.W.3d at 647. Finally, during the punishment phase, Lewis pleaded "true" to four prior felony conviction enhancements: possession of a controlled substance, second-degree robbery,

possession with intent to deliver a controlled substance, and second-degree sexual assault of a child. The defense offered no witnesses or evidence during the punishment phase.

Lewis has not demonstrated a reasonable likelihood that the jury was misled or that it assessed a higher sentence based upon any alleged misconstruction of the parole law in the charge. Nothing in the record suggests that the jury discussed, considered, or tried to apply (despite the judicial admonition not to apply) what they were told about good conduct time and parole. Neither the prosecutor nor defense attorney discussed good conduct time or parole in argument nor urged the jury to assess a greater (or lesser) sentence based upon good conduct time or parole. The jury did not send out any notes indicating or expressing confusion about the possible application of good conduct time or parole to Lewis. The jury did not assess the maximum sentence for the offense. *See Luquis*, 72 S.W.3d at 366-68; *Hooper*, 255 S.W.3d at 272. We conclude that any error in the charge on punishment did not result in egregious harm. We overrule Lewis's eighth and ninth issues.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

26

Submitted on November 12, 2021
Opinion Delivered December 29, 2021
Do Not Publish

Before Kreger, Horton and Johnson, JJ.